FILED

NOV 1 8 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FREEPORT PARTNERS, LLC, 201 Trenor Drive, )
New Rochelle, NY 10804, individually and on )
behalf of all others similarly situated, )
                                             ) Civil Action No. _____
                    Plaintiff, )
                                             )
          v. )
                                             ) **CLASS ACTION COMPLAINT FOR**
JOSEPH L. ALLBRITTON, BARBARA B. ) **VIOLATIONS OF RICO STATUTE**
ALLBRITTON, ROBERT L. ALLBRITTON, ) **AND BREACH OF FIDUCIARY**
NATHAN BAXTER, JACQUELINE C. ) **DUTIES**
DUCHANGE, THOMAS F. FITZGERALD, )
HEATHER FOLEY, FREDERICK J. RYAN, JR., )   CASE NUMBER   1:04CV02030
ROBERT ROANE, JOHN A. SARGENT, )
STEPHEN J. TRACHTENBERG, J. CARTER )   JUDGE: Gladys Kessler
BEESE, CHARLES A. CAMALIER, TIMOTHY )
C. COUGHLIN, LAWRENCE I. HEBERT, )   DECK TYPE: General Civil
STEVEN B. PFEIFFER, ROBERT L. SLOAN, )
JACK VALENTI, WILLIAM L. WALTON, and )   DATE STAMP: 11/18/2004
EDDIE N. WILLIAMS, )
                                             )
                   Defendants. ) **JURY TRIAL DEMANDED**
                                           )

*JURY ACTION*

Plaintiff Freeport Partners, LLC, by its attorneys, alleges on behalf of itself and all others similarly situated, on information and belief based, *inter alia*, upon the investigation of its counsel, except as to those allegations which pertain to the named Plaintiff or its attorneys, which are alleged on personal information and belief, as follows:

## NATURE OF THE ACTION

1.    This is a RICO class action, seeking recovery of economic damages on behalf of shareholders of Riggs National Corporation ("Riggs"), the parent company of Riggs Bank, N.A. ("Riggs Bank"), from the Boards of Directors of Riggs and Riggs Bank ("Defendants") for the actions

*1*

complained of herein. Said actions constitute RICO violations harming Plaintiff in its property and breaches of Defendants' fiduciary duties to Riggs and its public shareholders.

2.     On May 13th, 2004, Riggs was fined $25 million by the Office of the Comptroller of the Currency and Financial Enforcement Network of the Treasury Department ("FinCEN") for willful violations by Riggs of its money laundering obligations.

3.     On July 15th, 2004, the Senate Permanent Subcommittee on Investigations (the "Subcommittee") released a report entitled "Money Laundering and Foreign Corruption: Enforcement and Effectiveness of the Patriot Act: Case Study Involving Riggs Bank" (the "Subcommittee Report"). The Subcommittee Report detailed how, since 1997, Defendants actively used Riggs Bank to facilitate money laundering on behalf of foreign dictator Augusto Pinochet of Chile ("Pinochet") and various Equatorial Guinea government officials, noted Defendants had likely facilitated the same sort of activity for various Saudi Arabian account holders, and recounted repeated failings by Defendants to implement legally mandated anti-money laundering protections.

4.     One day after the release of this report, on July 16th, 2004, PNC Financial Services Group, Inc. ("PNC") agreed to purchase Riggs for approximately $779 million, or at the time the merger was announced, about $24.25 per share. In conjunction with this acquisition, Riggs shareholders will receive a combination of cash and PNC common stock.

5.     This price represents an extremely low valuation of Riggs based on its assets and book value.

6.     Plaintiff alleges the depressed acquisition price was a direct result of Defendants' facilitation of money laundering activities, persistent non-compliance with various applicable banking

2

laws, and repeated breaches of Defendants' fiduciary duties. Riggs' shareholders have thus been harmed by Defendants' activity.

## JURISDICTION AND VENUE

7.     This action arises under Title IX of the Organized Crime Control Act of 1970 (18 U.S.C. §§ 1961-1968) (the Racketeer Influenced and Corrupt Organization Act) ("RICO").

8.     Jurisdiction over this matter resides in this Court pursuant to 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. § 1367 (supplemental jurisdiction), and 18 U.S.C. §1964(a) and (c) (RICO).

9.     In connection with the acts and conduct alleged, Defendants directly and/or indirectly used means and instrumentalities of interstate commerce including, but not limited to, interstate wire and telephone communications, the United States Mail, and other interstate express carriers.

10.     Venue in this matter is proper in this district court pursuant to 15 U.S.C. §77v(a) and 15 U.S.C. §78aa in that several Defendants are found, are inhabitants of, and/or transact business in this district; and pursuant to 28 U.S.C. §1391(b) in that a substantial part of the actions or omissions giving rise to these claims arose in this district; pursuant to 18 U.S.C. §1965(a) in that several Defendants are found, have an agent, and/or transact their affairs from within the district; and pursuant to 18 U.S.C. §1965(b) in that, with respect to the allegations made, the ends of Justice require that all Defendants be brought before this Court.

## THE PARTIES

11.     Plaintiff owned Riggs common stock on July 15, 2004, and continues to own such stock.

3

12.    Riggs is a publicly traded bank holding company, incorporated in Delaware and headquartered in Washington, D.C. Riggs' principal executive offices are located at 1503 Pennsylvania Ave., N.W., Washington, D.C., 20005, and Riggs is listed on the NASDAQ national market under the ticker symbol RIGS. Riggs Bank, the principal subsidiary of Riggs, is a financial institution incorporated in Delaware and operating throughout the Washington, D.C. metropolitan area. The Riggs and Riggs Bank Boards of Directors often meet jointly.

13.    Defendants are current and former members of the Riggs and Riggs Bank boards of directors, all of whom served at the time the violations detailed herein occurred. Defendants facilitated the actions detailed herein.

14.    Defendant Joseph Allbritton is a board member who served as a bank director from 1981 until 2004. Mr. Allbritton was Chairman of the Board of both Riggs and Riggs Bank for many years. He additionally served as the Chief Executive Officer of both institutions from 1983 - 2000. Allbritton is Senior Chairman of the International Committee and therefore is and was in a position to monitor Riggs Banks' relationships with international customers at the time the conduct detailed herein occurred.

15.    Defendant Barbara B. Allbritton is the wife of Joseph Allbritton. Ms Allbritton served as a director of Riggs from 1991 - 1996 and served on the Riggs Bank board until resigning in 2004. The action detailed herein occurred during Ms. Allbritton's tenure on the board.

16.    Defendant Robert Allbritton is Joseph and Barbara Allbritton's son. In February 2001, the junior Allbritton succeeded his father as Chairman of the Board of Riggs Bank and also became Chairman of the Board and CEO of Riggs National Corporation. He is also a director of Riggs Bank

4

Europe Limited, an indirect subsidiary of Riggs. As such, he was in a position to monitor Riggs Bank's relationships with international customers at the time the conduct detailed herein occurred.

17. Defendant J. Carter Beese, Jr., a Riggs director since 2001, is President of Riggs Capital Partners, LLC, and Riggs Capital Partners II, LLC, both of which are venture fund subsidiaries of Riggs. Beese serves on the International Committee, and as such was in a position to monitor Riggs Bank's relationships with international customers at the time the conduct detailed herein occurred.

18. Defendant Timothy C. Coughlin, a Riggs director since 1988, has been the President of Riggs since 1992 and is a director of J. Bush & Co. Incorporated and Chairman of Riggs Investment Advisors Inc., both indirect subsidiaries of Riggs. Coughlin serves on the Executive and International Committees, and as such was in a position to monitor Riggs Bank's relationships with international customers at the time the conduct detailed herein occurred.

19. Defendant Lawrence I. Hebert, a Riggs director since 1988, became a director and President and Chief Executive Officer of Riggs Bank in February 2001. In addition, he is a director of Riggs Investment Advisors, Inc., and Riggs Bank Europe Limited, both of which are Riggs' indirect subsidiaries. Hebert serves on the Executive and International committees, and as such was in a position to monitor Riggs Bank's relationships with international customers at the time the conduct detailed herein occurred.

20. Defendant Steven B. Pfeiffer, a Riggs director since 1989, is Chairman of the Executive Committee and Head of the International Department of the law firm of Fulbright & Jaworski, L.L.P. Pfeiffer chairs Riggs' International Committee, and as such was in a position to monitor Riggs Bank's relationships with international customers. Pfeiffer also serves on Riggs' Audit Committee. Pfeiffer's

law firm performs legal services for Riggs. Pfeiffer had knowledge of and facilitated Riggs' dealings with Pinochet, detailed below.

21.     Defendant Robert L. Sloan, a Riggs director since 1993, is a vice chairman of the Board and has been President and Chief Executive Officer of Sibley Memorial Hospital in Washington, D.C. since 1985. He chairs the Audit Committee and is also Vice Chairman of the Executive Committee. Mr. Sloan served on the Riggs board at the time the conduct detailed herein occurred.

22.     Defendant Jack Valenti, a Riggs director since 1986, was Chairman and Chief Executive Officer of the Motion Picture Association, as well as President and Chief Executive Officer of the Motion Picture Association of America, Inc., until his retirement from these posts earlier this year. Mr. Valenti served on the Riggs board at the time the conduct detailed herein occurred.

23.     Defendant William L. Walton, a Riggs director since 1999, is Chairman, Chief Executive Officer, President, and a director of Allied Capital Corporation. Riggs Bank has a $60 million commitment under Allied Capital's revolving line of credit. Mr. Walton served on the Riggs board at the time the conduct detailed herein occurred.

24.     Defendant Eddie N. Williams, a Riggs director since 1993, has been President and Chief Executive Officer of the Joint Center for Political and Economic Studies since 1972. Riggs is one of the top corporate donors to the Joint Center and Joseph Allbritton has helped the Joint Center raise funds. Mr. Williams served on the Riggs board at the time the conduct detailed herein occurred.

25.     Other Defendants are members of the Riggs Bank Board of Directors. This includes Nathan Baxter, Jacqueline C. Duchange, Thomas F. Fitzgerald, Heather Foley, Frederick J. Ryan, Jr., Robert Roane, John A. Sargent, and Stephen J. Trachtenberg. These Defendants were board

members at the time the conduct detailed herein occurred.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure

on behalf of all shareholders of Riggs as of July 15, 2004. Excluded from the Class are the Defendants,

officers and directors of Riggs or Riggs Bank, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which any of the Defendants have or had

a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable.

The disposition of their claims in a class action will provide substantial benefits to the parties and the

Court. As of October 29, 2004, Riggs had more than 31.61 million shares outstanding.

28.     Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and all

members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.* they were

injured in their property as a result of Defendants' RICO violations.

29.     Plaintiff will fairly and adequately protect and represent the interests of the Class.

Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

30.     Plaintiff is represented by counsel who are experienced and competent in the

prosecution of class action litigation.

31.     There is a well-defined community of interest in the questions of law and fact involved in

this case. Questions of law and fact common to the members of the Class which predominate over

questions which may affect individual Class Members include:

            a.      Whether the Defendants violated, inter alia, the Racketeer Influenced and

Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*;

b.  Whether the Class has been damaged and, if so, the extent of such damages and/or the nature of the equitable relief, statutory damages, or exemplary damages which the Class is entitled to plead and prove;

c.  Whether the acquisition price of Riggs was depressed as a result of Defendant's actions and, if so, to what extent; and

d.  Whether Defendants have breached their fiduciary duties to shareholders.

32.  A class action is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

33.  Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## FACTUAL ALLEGATIONS

### A.  Failure to Comply with Federal Anti-Money Laundering Laws:

34.  Both the Bank Secrecy Act (31 U.S.C. §§ 5311 *et seq*.) and the USA Patriot Act of 2001 (Pub.L. No. 107-56, 115 Stat. 272 (2001))  require banks to implement anti-money laundering

8

programs.

35.     The elements of an effective anti-money laundering program for banking institutions are

well established.  The Federal Reserve has published detailed guidelines on the implementation of such

programs for private banking institutions.  These guidelines recommend banks develop written anti-

money laundering procedures, including, *inter alia*, so-called "know-your-customer" policies and

procedures and further recommend that banks perform careful due diligence reviews before accepting

new clients, involving compiling basic background information on each client for whom an account is

opened including the client's name, address, form of identification, business, source of wealth, and the

type and volume of transactions expected to pass through clients' accounts.

36.     Additionally, the Bank Secrecy Act and the regulations promulgated thereunder,

specifically 12 C.F.R. §§208.62(h) and (i), also impose direct obligations on the director defendants

to assure the timely filing of Suspicious Activity Reports[1] - key enforcement and compliance tools

against money laundering and suspicious offshore activity.

37.     From 1997 to 2004, Riggs Bank has repeatedly been cited by the Office of the

Comptroller of Currency ("OCC") and by their own auditors for having weak anti-money laundering

controls.

38.     In 2002 and 2003, Riggs Bank was the subject of media reports about questionable

transactions and accounts involving officials from Saudi Arabia and Equatorial Guinea.  In response,

---

[1] Federal banking regulations require the filing of Suspicious Activity Reports with the
appropriate Federal law enforcement agencies and the Department of the Treasury under certain
circumstances, as set forth in 12 C.F.R. § 208.62(c).

the OCC initiated intensive examinations of various Riggs accounts.

39.      One investigation, conducted by the Minority Staff of the Senate Committee on
Government Affairs' Permanent Subcommittee on Investigations, focused on Riggs' handling of
accounts for Augusto Pinochet and Equatorial Guinea and resulted in the Subcommittee Report.

40.      Another investigation, conducted by the full Senate Committee on Government Affairs,
focused on accounts opened by Riggs for Saudi Arabian officials.  This investigation is still ongoing.

41.      On July 16, 2003, Riggs Bank entered into a Stipulation and Consent to the Issuance
of a Consent Order and a Consent Order (collectively, the "Consent Order") with the OCC.  The
Consent Order required Riggs Bank to take various actions to ensure compliance and improve the
monitoring of compliance with the Bank Secrecy Act ("BSA"), requiring in relevant part that banks
report cash transactions of $10,000 or more, and related rules and regulations.  The Consent Order
allows the OCC to take future actions it deems necessary, including the imposition of a monetary
penalty.

42.      On March 2, 2004, the OCC advised Riggs Bank that it was considering whether to
institute a civil money penalty action against Riggs Bank and that such action would be based upon the
OCC's allegations that Riggs Bank violated the BSA and related rules and regulations, failed to
comply with the Consent Order, and failed to implement adequate controls to ensure that Riggs Bank
operates in a safe and sound manner with respect to BSA matters.  The OCC informed Riggs Bank
that it might seek unspecified modifications to the Consent Order or an additional consent order.
Many of the regulatory violations alleged by the OCC predate the Consent Order.

43.      The OCC also informed Riggs Bank that it was considering whether to subject Riggs

Bank to increased regulatory supervision and operational restrictions. In particular, the OCC advised Riggs Bank that primarily as a direct result of its BSA violations, that it expects to designate Riggs Bank as being in a "troubled condition." A bank that is classified as being in a "troubled condition" must have any new director or executive officer approved in advance by the OCC and is subject, along with its holding company, to a prohibition on making severance payments to directors, officers, and employees under the FDIC's "golden parachute rules." The increased regulatory supervision is expected to result in more frequent and intensive examinations.

44.     Also on March 2, 2004, Riggs Bank was advised by FinCEN that it was evaluating whether it is appropriate for FinCEN to assess a civil monetary penalty and/or take additional enforcement action against Riggs Bank for apparent *willful* violations of BSA and related rules and regulations. FinCEN generally characterized its concerns as: (1) failure by Riggs Bank to establish and implement an adequate anti-money laundering program; (2) failure by Riggs Bank to properly prepare and file Suspicious Activity Reports; and (3) failure by Riggs Bank to file accurate Currency Transaction Reports.[2]

45.     In May 2004, the OCC and FinCEN fined Riggs Bank $25 million for failing to file Currency Transaction and Suspicious Activity Reports, for willfully violating its legal obligations to implement an adequate anti-money laundering program, and for failing to comply with the consent order. This is the ***largest fine ever*** assessed under the Bank Secrecy Act.

---

[2] Most financial institutions, including Riggs Bank, are required, pursuant to 31 C.F.R. § 103.22, to file Currency Transaction Reports on IRS Form 4789 for any transaction (cash in or cash out) in currency over $10,000.

46.    On July 15th, 2004, the Subcommittee Report was released. The Subcommittee

Report specifically identified deficiencies in Riggs Bank's anti-money laundering efforts, including:

a.    Usage of an information system unable to identify all the accounts opened for a

single client, thereby impeding efficient oversight;

b.    Lack of a system for identifying which of its clients had low, medium, or high

money laundering risks;

c.    Poor "know-your-customer" documentation for international private banking

clients and Embassy accounts;

d.    Lack of an effective system for identifying and monitoring accounts opened by

political figures;

e.    Failing to conduct routine monitoring of any of its high risk accounts;

f.    Failing to oversee clients' wire transfer activity to identify specific transactions;

g.    Failing to implement an effective procedure for filing the Suspicious Activity

Reports required by the Bank Secrecy Act;

h.    Lack of an efficient system for alerting its personnel to the bank's receipt of a

subpoena requesting information about a particular account;

i.    Laxity of the banks' internal audit department;

j.    Failing to provide adequate anti-money laundering training for its employees;

k.    Lack of an effective system for supervising its account managers; and

l.    Failing to act on regulators' directives to improve the banks' anti-money

laundering program.

47.   Riggs Bank investigators have found evidence of possible criminal activities by some former Riggs employees.

48.   Riggs Bank is also the subject of criminal investigations by the U.S. Attorney's Office for the District of Columbia and the United States Department of Justice.

### B.   Equatorial Guinea

49.   Equatorial Guinea is a West African country, ruled since 1979 by President Teodoro Obiang Nguema Mbasango ("President Obiang"). Elections in Equatorial Guinea have been described by the United States State Department as "marred by extensive fraud and intimidation." The State Department has also been highly critical of the country's human rights abuses, use of torture, and culture of corruption, and the International Monetary Fund has been critical of the country's lack of transparency and accountability on fiscal matters.

50.   Equatorial Guinea opened their first accounts with Riggs Bank in 1995.  Overall, Riggs Bank managed more that 60 accounts and certificates of deposit ("CDs") for Equatorial Guinea, its officials, and their family members.  In doing so, they facilitated numerous suspicious transactions without notifying law enforcement, paid little or no attention to the bank's anti-money laundering obligations, and turned a blind eye to evidence suggesting the bank was handling the proceeds of foreign corruption.

51.   Equatorial Guinea eventually became the largest single relationship in Riggs Bank.  The Equatorial Guinea account manager sent top Riggs Bank officials periodic memoranda concerning developments related to the Equatorial Guinea accounts.

52.   Of the 60 accounts and CDs opened for Equatorial Guinea clients at Riggs Bank, at

13

least half functioned as private banking accounts for senior Equatorial Guinea officials or their family members.

53.     Riggs Bank also helped President Obiang and his sons establish at least two offshore shell corporations and open bank accounts in their names.  These corporations were Otong, S.A. and Awake, Ltd., both offshore corporations incorporated in the Bahamas.

54.     The accounts Riggs Bank opened for Equatorial Guinea included:

a.      E.G. Oil Account: A standard business checking account in the name of "Republica de Guinea Ecuatorial-Tesoreria General," primarily used to hold proceeds from various oil companies doing business in the Equatorial Guinea.

b.      E.G. Investment Accounts: Riggs had a standard money market account liked to two Riggs investment accounts.

c.      Other E.G. Government Accounts: Various other accounts and CDs were also opened in the name of the Republic of Equatorial Guinea.

d.      E.G. Embassy Accounts: Eight accounts were opened at Riggs in the name of the "Embassy of Equatorial Guinea."

e.      E.G. Student Accounts: Two accounts were opened in the name of the Equatorial Guinea government and used to pay the expenses of students studying in the United States.

f.      Otong Accounts: One account and two CDs were opened in the name of Otong S.A.  President Obiang was the beneficial owner of both the account and the CDs.

g.      Constancia Nsue Accounts: Five accounts and three CDs were opened in the name of Constancia Mangue Nsue (President Obiang's wife), both as a sole and joint owner.

14

h.      Teodoro Nguema Obiang Accounts: Teodoro Nguema Obiang (President Obiang's son) was the beneficial owner of three accounts opened in the name of TNO Entertainment LLC and Awake, Ltd. - both companies he controlled.

I.      Teodoro Biyogo Nsue and Elena Mensa Accounts: Several accounts were opened for Teodoro Biyogo Nsue (Equatorial Guinea's Ambassador to the United States) and his family.

j.      Melchor Edjo Accounts: One account and two CDs were opened in the name of Melchor Esono Edjo, Secretary of State for Treasury and Budget in Equatorial Guinea.

k.      Armengol Ondo Ngumea Accounts: One account and one CD were opened in the name of Armengol Ondo Nguema, President Obiang's brother and the Director of National Security in Equatorial Guinea.

l.      Pastor Micha Ondo Bile Accounts: Two accounts and four CDs were opened in the name of Pastor Micha Ondo Bile, Minister of Foreign Affairs in Equatorial Guinea.

m.      Boriko, Nseng, and Edjo Accounts: Three separate accounts were opened for Miguel Abia Biteo Boriko, former Minister of the Economy in Equatorial Guinea, Juan Olo Mba Nseng, former Minister of Mining and now Director of Electricity in Equatorial Guinea, and Baltasar Engongo Edjo, Minister of Economic Affairs and Finance.

n.      Makina Accounts. Three accounts with minor balances were opened in the name of Sisinio E Mbana Makina, the former First Secretary of Equatorial Guinea who was employed at the Equatorial Guinea embassy.

o.      Business Accounts. Three accounts were opened in the name of Equatorial

15

Guinea businesses. Ecuato Guineana de Aviacion, one of Equatorial Guinea's two national airlines, opened one money market account at Riggs in 2001. GEPetrol, the Equatorial Guinea state oil company, opened a corporate wholesale checking account and a business money market account.

55.     On repeated occasions, Riggs Bank facilitated large cash transactions involving the Equatorial Guinea accounts.

56.     On six occasions between 2000 and 2002, Riggs Bank accepted cash deposits of $1 million or more into the Otong account, for a total of $11.5 million. These transfers included:

| | |
|---|---|
| April 20, 2000 | $1.0 million cash deposit |
| March 8, 2001 | $1.0 million cash deposit |
| March 20, 2001 | $1.5 million cash deposit |
| Sept. 5, 2001 | $2.0 million cash deposit |
| Sept. 17, 2001 | $3.0 million cash deposit |
| April 12, 2002 | $3.0 million cash deposit |

57.     On at least two occasions, Riggs Bank account manager Simon Kareri obtained the cash for these deposits from senior Equatorial Guinea officials and then transferred the cash to the bank in large suitcases.

58.     Riggs Bank did not decline to complete any of the transactions or identify or report any of them as suspicious activity.

59.     The Currency Transaction Reports Riggs Bank filed in connection with these transactions incorrectly described Otong, S.A. as an exporter of timber, rather than an offshore corporation controlled by President Obiang.

60.     Large cash payments were also made on repeated occasions to a Constancia Nsue account, totaling $495,875. These included:

| | |
|---|---|
| Jan. 24, 2000 | $150,000.00 cash deposit |
| Feb. 1, 2000 | $ 20,000.00 cash deposit |
| Sept. 5, 2000 | $ 25,000.00 cash deposit |
| Sept. 13, 2000 | $ 50,000.00 cash deposit |
| March 8, 2001 | $ 50,875.00 cash deposit |
| March 8, 2001 | $100,000.00 cash deposit |
| Sept. 17, 2001 | $100,000.00 cash deposit |

61.     This account also had numerous foreign currency transactions allegedly involving

checks written in Euros being converted into U.S. dollars by the bank before depositing the dollars

into the Constancia Nsue account, some of which were marked by Riggs Bank as "cash deposits."

When asked by the OCC for copies of the Euro checks, Riggs Bank failed in some cases to produce

any copies.  These transactions totaled $3,126,652.20 and included:

| | |
|---|---|
| Sept. 20, 1999 | $114,134.71 |
| Nov. 19, 1999 | $201,382.86 |
| March 30, 2000 | $425,235.12 |
| July 11, 2000 | $494,811.32 |
| Jan. 16, 2001 | $156,491.39 |
| March 8, 2001 | $104,417.33 |
| May 8, 2001 | $274,762.41 |
| July 25, 2001 | $ 56,632.56 |
| Oct. 1, 2001 | $223,836.99 |
| Nov. 15, 2001 | $ 64,068.46 |
| Jan. 15, 2002 | $413,337.15 |
| April 6, 2002 | $ 58,421.24 |
| April 12, 2002 | $231,618.22 |
| Aug. 26, 2002 | $168,066.49 |
| Nov. 13, 2002 | $139,435.95 |

62.     A joint Constancia Nsue account also received large cash payments totaling

$934,209, four of which took place on the same days as the cash payments recounted in ¶ 60.  These

included:

| | |
|---|---|
| Jan. 24, 2000 | $ 50,000.00 cash deposit |

17

| | |
|---|---|
| Feb. 1, 2000 | $ 70,000.00 cash deposit |
| Feb. 4, 2000 | $ 20,000.00 cash deposit |
| Sept. 5, 2000 | $300,000.00 cash deposit |
| March 16, 2001 | $200,000.00 cash deposit |
| March 20, 2001 | $ 80,000.00 cash deposit |
| Sept. 17, 2001 | $ 20,000.00 cash deposit |
| Feb. 8, 2002 | $100,000.00 cash deposit |
| Sept. 5, 2002 | $ 20,000.00 cash deposit |
| Dec. 23, 2002 | $ 74,209.00 cash deposit |

63.     Riggs Bank therefore enabled President Obiang and his wife to make at least $13 million in cash deposits into their Riggs Bank accounts over a three year period.

64.     Riggs Bank failed to file a single Suspicious Activity Report despite the size of the transfers, the fact that Constancia Nsue was depositing hundreds of thousands of dollars in cash into her personal account and the account shared with her brother, and the fact that President Obiang was depositing millions of dollars in cash into his offshore Riggs Bank accounts.

65.     Riggs Bank also facilitated numerous wire transfers by Equatorial Guinea involving frequent and sizeable transfers of funds across international lines.

66.     From June 2000 to December 2003, sixteen wire transfers were sent from the E.G. Oil Account held at Riggs Bank to Kalunga Company SA, an Equatorial Guinea corporation, totaling over $26.5 million. All of these transfers were sent from Riggs Bank to a Kalunga Company account at Banco Santander in Madrid, Spain. These transfers included:

| | |
|---|---|
| June 7, 2000 | $1,332,044.00 wire transfer |
| Aug. 10, 2000 | $1,110,000.00 wire transfer |
| Sept. 5, 2000 | $ 292,200.00 wire transfer |
| Oct. 16, 2000 | $1,362,500.00 wire transfer |
| Jan. 30, 2001 | $2,698,800.00 wire transfer |
| April 10, 2001 | $1,349,400.00 wire transfer |
| May 9, 2001 | $1,349,400.00 wire transfer |

18

| | |
|---|---|
| May 7, 2002 | $ 798,000.00 wire transfer |
| June 26, 2002 | $ 167,000.00 wire transfer |
| Oct. 31, 2002 | $ 336,934.57 wire transfer |
| April 7, 2003 | $7,425,000.00 wire transfer |
| July 24, 2003 | $ 770,567.00 wire transfer |
| Sept. 3, 2003 | $ 335,137.00 wire transfer |
| Nov. 21, 2003 | $4,800,000.00 wire transfer |
| Dec. 11, 2003 | $1,637,000.00 wire transfer |
| Dec. 11, 2003 | $ 720,000.00 wire transfer |

67.    From July 2000 to November 2001, ten wire transfers were sent from the E.G.

Oil Account held at Riggs Bank to Apex Trading Ltd., totaling $8.1 million. Nine of these were

sent to an Apexside account a Credit Commercial de France in Luxembourg and one was sent to

an Apexside account at HSBC in Luxembourg. These transfers included:

| | |
|---|---|
| July 10, 2000 | $ 697,400.00 wire transfer |
| Aug. 28, 2000 | $1,096,800.00 wire transfer |
| Oct, 16, 2000 | $1,561,587.30 wire transfer |
| Jan. 10, 2001 | $ 538,953.00 wire transfer |
| April 10, 2001 | $2,127,385.00 wire transfer |
| May 30, 2001 | $ 45,580.00 wire transfer |
| July 18, 2001 | $ 246,707.05 wire transfer |
| July 25, 2001 | $ 167,304.76 wire transfer |
| Aug. 2, 2001 | $1,233,835.00 wire transfer |
| Aug. 22, 2001 | $ 389,939.83 wire transfer |

68.    Three wire transfers over an eight month period were sent from the E.G. Oil

Account held at Riggs Bank to Jadini Holdings, Ltd. at a bank account in Virginia. These

transfers totaled just over one million and included:

| | |
|---|---|
| July 5, 2001 | $ 700,000.00 wire transfer |
| July 5, 2001 | $ 329,926.00 wire transfer |
| March 20, 2002 | $ 66,751.78 wire transfer |

69.    Three transfers went from the E.G. Oil Account held at Riggs Bank to personal

accounts controlled by the Equatorial Guinea Secretary of State for Treasury and Budget, Melchor

Esono Edjo.  These accounts totaled $499,000 and included:

| | |
|---|---|
| March 13, 1998 | $ 122,000.00 wire transfer |
| May 27, 1998 | $ 122,000.00 wire transfer |
| June 12, 2002 | $ 255,000.00 wire transfer |

70.     Riggs Bank failed to identify any of these transactions as suspicious at the time they

occurred and failed to question any of the transfers until the Congressional subcommittee and OCC

began their investigations.

71.     Riggs Bank also provided Equatorial Guinea with other banking services.  This

included providing Equatorial Guinea clients with a variety of credit arrangements addressing

governmental and Embassy concerns as well as individual officials' needs, managing two Riggs Bank

accounts used to provide educational funding for Equatorial Guinea students (funded by oil companies

and primarily benefitting the children of wealthy or powerful Equatorial Guinea officials), and other

questionable services related to procurement matters and financial advice

72.     Riggs Bank also aided and abetted numerous oil companies in committing violations of

the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, which criminalizes illicit payments to

foreign public officials by U.S. businesses and individuals.

73.     The Subcommittee Report noted that "[o]il companies operating in Equatorial Guinea

may have contributed to corrupt practices in that country by making substantial payments to, or

entering into formal business ventures with individual E.G. officials, their family members, or the entities

they control, with minimal public disclosure of their actions."  These actions constitute violations of the

Foreign Corrupt Practices Act.

20

74.     At least four of these companies are currently being probed by the Securities and Exchange Commission for these actions.  These companies include Exxon Mobil Corporation, Marathon Oil Corporation, Amerada Hess Corporation, and ChevronTexaco Corporation.

75.     These substantial payments were made through Riggs Bank.  Riggs Bank additionally allowed President Obiang to siphon millions of dollars from Equatorial Guinea's oil account to his personal account.

76.     Riggs Bank accordingly aided and abetted the aforementioned oil companies in their violations of the Foreign Corrupt Practices Act.

77.     Riggs Bank failed to cooperate with the Subcommittee investigation, initially identifying only about half the Equatorial Guinea accounts at the bank and producing limited account documentation and electronic mail regarding those accounts.

78.     Additionally, Riggs failed to undertake a detailed internal review of Riggs Bank accounts until late 2003, despite having received a subpoena from the Subcommittee in March 2003.

79.     Riggs Bank did not close the Equatorial Guinea accounts until June and July of 2004.

**C.     Augusto Pinochet**

80.     Augusto Pinochet Ugarte was president of Chile from 1973 - 1990, and was Commander in Chief of the Chilean army until 1998.  Pinochet has been accused of involvement with human rights abuses, torture, assassinations, death squads, drug trafficking, arms sales, and corruption. He has been the subject of repeated litigation in Spain, the United Kingdom, Chile, and other countries.

81.     Riggs Bank served as a banker to Pinochet for at least eight years, beginning in 1994.

21

This was the result of efforts by senior Riggs Bank officials (including Defendant Joe Allbritton) to actively seek Pinochet's business, including a trip by a delegation of Riggs Bank officials to meet with Pinochet and ask him to open an account with Riggs Bank.

82.     From 1994 - 2002, Riggs Bank opened at least three personal accounts for Mr. Pinochet.

83.     In April 1996, Riggs Bank & Trust Co. (Bahamas) Ltd., a Bahamian subsidiary of Riggs, established Ashburton Investment Co., Ltd. ("Ashburton"), a corporation nominally owned by the Ashburton Trust, also established by Riggs. The trustee of the Ashburton Trust is Riggs Bank & Trust Co. (Bahamas) Ltd.; the settlors are Mr. and Mrs. Pinochet; and the trust beneficiaries are their five children. Riggs Bank personnel were named as the officers and directors of Ashburton, so that Mr. Pinochet's name never appeared on the incorporation papers.

84.     In February 1998, Riggs Bank incorporated Althorp Investment Co., Ltd. ("Althorp"), using a similar structure to that utilized for Ashburton. This was done to avoid a direct, public association between Mr. Pinochet and Althorp.

85.     Riggs Bank opened several bank and investment accounts in the name of Ashburton and Althorp and issued numerous 90-day CDs for both corporations.

86.     In October 1998, a Spanish magistrate issued two international arrest warrants for Mr. Pinochet for human rights abuses, including, *inter alia*, murder, torture, hostage-taking, and genocide. On October 17, 1998, Pinochet was arrested at a London hospital. In conjunction with the ensuing litigation, a Spanish magistrate issued an attachment order against all bank accounts held directly or indirectly by Mr. Pinochet, his family members, or third parties in any country. On November 5,

22

1998, Spain's highest criminal court affirmed criminal jurisdiction over Mr. Pinochet and on December

10, 1998, ratified the attachment order against Pinochet bank accounts. In the United Kingdom the

British Law Lords denied Mr. Pinochet's claim of diplomatic immunity to prosecution, then set aside

that determination on December 17, 1998. On March 24, 1999, the Law Lords authorized an

extradition hearing to determine whether Mr. Pinochet should be transferred to Spain.

87.     Two days later, on March 26, 1999, Riggs Bank allowed Pinochet to prematurely

terminate the £1 million CD held in the name of Althorp at Riggs in London, and transfer the funds,

totaling $1.6 million in U.S. dollars, to a new CD in the United States. Riggs Bank did not file any

Suspicious Activity Reports that would have alerted British or U.S. law enforcement to the existence

of the Pinochet funds.

88.     In March 2000, the British Home Secretary determined that Pinochet was unfit to

stand trial due to poor health and terminated the extradition proceedings. Pinochet immediately

departed for Chile. Later that same month, senior Riggs Bank officials traveled to Chile and met with

Pinochet.

89.     In April 2000, Chilean lawyers filed suit in Chile to remove Pinochet's immunity from

prosecution due to his status as a Senator. In May 2000, as this litigation continued, Riggs closed the

final Pinochet account in London and transferred the remaining funds to a newly-opened Ashburton

account at Riggs Bank in the United States. Senior Riggs Bank officials, including the general counsel,

were informed of and agreed to this transfer. Riggs Bank failed to file any Suspicious Activity Report

with any office of law enforcement.

90.     In August 2000, a Chilean appellate court upheld a lower court decision eliminating his

immunity from prosecution, and on December 1, 2000, a Chilean judge indicted Pinochet for human rights violations.

91.     On December 10, 2000, a British newspaper reported Pinochet had over $1 million in a Riggs Bank account in the United States. In response to that article, in late December or early January 2001, Riggs Bank changed the official names on the personal account controlled by Pinochet from "Augusto Pinochet Ugarte & Lucia Hiriart de Pinochet" to "L.Hiriart &/or A. Ugarte." By changing the official account names in this manner, Riggs Bank ensured that any manual or electronic search for the name "Pinochet" would not identify any accounts at the bank.

92.     On January 29, 2001, Pinochet was placed under house arrest in Chile. On May 15, 2001, Bermuda officials announced that they had carried out an asset seizure in response to the Spanish attachment order and frozen accounts belonging to Pinochet in a Bermuda subsidiary of Standard Life Insurance. In response, Pinochet lawyers were quoted in the news media as saying that Pinochet "has no bank accounts outside Chile."

93.     A week later, on May 21, 2001 a lawyer at Fulbright & Jaworski provided a memorandum to Steven Pfeiffer, a senior partner at the law firm and long-time member of the Riggs Board of Directors. This memorandum described the Spanish attachment order, some pending legal actions against Pinochet, and a pending indictment. Attached to the memorandum were eleven news articles discussing Pinochet and describing his involvement with corruption, narcotics, arms sales, and other misconduct.

94.     On this same day, Mr. Pfeiffer forwarded the memorandum and news articles to two senior Riggs officials, the general counsel, and to the head of the International Banking Group. He

included his own memorandum, which began: "As requested by Ray [Lund, Riggs' Executive Vice President of International Banking] last Friday, over the week-end we reviewed certain online public news sources for articles that address the source of General Augusto Pinochet's wealth and/or *attempts to freeze and/or seize General Pinochet's assets*." (emphasis added). The memorandum stated that, while the searches did not uncover much information on the source of Mr. Pinochet's wealth, they did identify articles discussing "demands by 'leading political figures' in Chile to investigate the source of the Pinochet family's fortune" and efforts by the Spanish judge "to search for assets of Pinochet in the United States, Switzerland and Luxembourg."

95.    This memoranda demonstrates that senior Riggs Bank officials were fully aware of the Pinochet attachment order and seizure actions taking place in other countries, of questions about the source of Mr. Pinochet's wealth, and allegations of Pinochet's involvement with a variety of crimes. They also suggest that Riggs was analyzing its own legal obligations.

96.    In 2002, Riggs Bank closed the Pinochet accounts and, despite the attachment proceedings, sent the funds directly to Pinochet. Riggs Bank took no action to disclose the Pinochet accounts to any court or office of law enforcement.

97.    In addition to the above activities, Riggs Bank took questionable legal actions to help Pinochet utilize the funds in his U.S. bank accounts while in Chile.

98.    On August 18, 2000, Riggs Bank issued eight sequentially numbered cashiers checks payable to Pinochet. Riggs Bank then paid for the private banker who sometimes handled the Pinochet relationship to travel to Chile so that he could hand deliver the checks to Pinochet. Pinochet then cashed these checks over the next several months.

99.    On May 15, 2001, Riggs Bank again used Pinochet funds to issue ten sequentially numbered cashiers checks for $50,000 each, payable to Maria Hiriart and Augosto P. Ugarte, which were then sent by overnight delivery to Chile.  These checks were drawn from Riggs Bank's own concentration account rather than from Pinochet's accounts.  This meant that Pinochet could cash the checks without fear that they could be traced back to one of his accounts at Riggs Bank.

100.    On October 11, 2001, Riggs Bank repeated the action a third time, issuing ten sequentially numbered cashiers checks for $50,000 each, payable to Maria Hiriart and Augosto P. Ugarte, which were then sent by overnight delivery to Chile.  These checks were drawn from Riggs Bank's own concentration account rather than from Pinochet's accounts.  This meant that Pinochet could cash the checks without fear that they could be traced back to one of his accounts at Riggs Bank.

101.    On April 8, 2002, Riggs Bank performed the same service one last time, mailing ten sequentially numbered $50,000 checks payable to Maria Hiriart and Augosto P. Ugarte to Pinochet. These were again cashed over the next several months.

102.    The total amount of cashiers checks Riggs Bank issued to Pinochet was $1.9 million.

103.    In addition to the aforementioned activity, Riggs Bank affirmatively attempted to hide the Pinochet relationship from bank examiners.

104.    In July 2000, Riggs omitted the Pinochet accounts from a list of accounts controlled by foreign political figures requested by the OCC as part of a routine OCC anti-money laundering inspection.

105.    In 2001, an OCC bank examiner reviewed the Althorp account as a result of a routine

26

sampling. When asked about Althorp's beneficial owner, Riggs Bank personnel responded that the owner was "a publicly known figure" in Chile; his Chilean family members "were diplomats," the account came from "Embassy [Banking]," the family members were "landowners" with "vineyards," and the Riggs Chairman of the Board "knows" the beneficial owner. However, Riggs Bank never revealed the owner of the accounts was Pinochet.

106. Additionally, when OCC examiners initially met with Riggs personnel to obtain additional information about the Pinochet accounts, Riggs personnel initially refused cooperation.

107. In June 2002, the OCC directed Riggs to file a Suspicious Activity Report about the Pinochet accounts so that law enforcement would be aware of them. Riggs complied in July 2002. The OCC considered the report so deficient, however, that it filed its own SAR soon after.

108. At all relevant times, Defendants were well aware of the Pinochet accounts. Senior bank officials were instrumental in bringing the first Pinochet account to Riggs Bank in late 1994. The account manager sometimes spoke directly to Mr. Allbritton about the Pinochet accounts. In 2000, key Riggs board members traveled to Chile to meet with Pinochet. In 2001, a Riggs board member informed senior officials at the bank about the Pinochet attachment order, pending legal actions against Pinochet, and accusations concerning his involvement with wrongdoing. In 2002, during the OCC examination, the head of Riggs' International Banking Group wrote to Riggs' then top anti-money laundering officer, indicating that "Riggs Bank Legal Affairs Division and Compliance Division have been aware of all activities relating to these accounts. At no time has the International Group acted on this account without the express consent of both the Legal Affairs and Compliance Divisions." In mid-2002, a Riggs board member provided a requested legal memorandum to the bank on whether it

could close the Pinochet accounts without incurring any liability from the client.

    **D.**    **Saudi Arabia**

    109.    Riggs also both facilitated and failed to report large movements of cash and other suspicious transactions in more than 150 accounts held by officials of Saudi Arabia.

    110.    These accounts included accounts by Saudi Prince Bandar bin Sultan.  During 2001 and 2002, Prince Bandar, his wife, or his aides withdrew more than $20 million in cash from their personal accounts.  Riggs Bank failed to file Suspicious Activity Reports on the withdrawals.

111.    These accounts are currently the subject of an ongoing investigation by the Senate Committee on Governmental Affairs.

    **E.**    **The PNC Merger**

    112.    On July 16, 2004, one day after the Subcommittee Report was released, PNC announced a plan to buy Riggs National Corp. for $321 million in cash and 7.5 million shares of PNC common stock (the "PNC Merger").  This represents a total value of approximately $779 million.

    113.    The purchase price represented only a 7% premium over the value of Riggs stock at the time the deal was announced, far less than the industry average.  Moreover, this amount was only approximately two times Riggs' book value, whereas banks typically are sold for at least three times the value of their assets.

    114.    Press releases by PNC released in conjunction with the PNC Merger indicate that PNC's valuation of Riggs involved below-median numbers for Premium/Core Deposits, Adjusted Premium/Core Deposits, Price/Book Value, and Price/Tangible Book Value when compared to comparable Market Extension Transactions.  Riggs was thus significantly devalued for purposes of the

merger when compared to recent similar transactions.

115.    The PNC Merger agreement contains strict "material adverse change" clauses which allow PNC to back out of the deal if Riggs's legal, financial, or regulatory situation poses undue risk to PNC.  PNC analysts and executives have indicated PNC expects to negotiate a price *below* the $779 million for the purchase of Riggs.

116.    The Subcommittee Report, coupled with the threat of future legal and regulatory action against Riggs and an ongoing Grand Jury investigation in the District of Columbia, provided Defendants' with significant incentive to sell Riggs at a reduced value.

117.    Defendants' active participation in money laundering and other related wrongful acts therefore both made the sale of Riggs necessary and reduced the price at which that sale could be made.

118.    This reduction in value is evidenced by Riggs' August 9, 2004 10-Q Securities and Exchange Commission filing, which revealed Riggs' lost $34.4 million in the second quarter of 2004. This filing also revealed $42 million in unusual expenses during this quarter, including the $25 million fine and an additional $7.2 million spent on dealing with regulatory fallout and money-laundering compliance.

119.    Riggs has gone on to lose over $10 million in the third quarter of 2004, largely the result of $13 million in fees for legal services aimed at helping them deal with criminal, regulatory, and civil issues arising as a result of Defendants' conduct.

120.    Riggs executives are nevertheless eligible to receive more that $7 million in severance pay if they leave the company after the sale, as well as $2.2 million from cash payouts of unvested

29

stock options.  In particular, defendant Robert L. Allbritton would receive $850,000.  This is above

and beyond any proceeds they may receive for Riggs stock they hold personally.

## FIRST CLAIM FOR RELIEF

### (18 U.S.C. § 1964(c))

121.    Plaintiff repeats and realleges all previous allegations as if set forth herein.

122.    Plaintiff is a "person" within the meaning of 18 U.S.C. §1961(3) and 18 U.S.C.

§1964(c) and brings this action pursuant to 18 U.S.C. §1964(c).

123.    Each of the Defendants named in this Count, hereinafter sometimes collectively

referred to as the "RICO Defendants," is a "person" within the meaning of 18 U.S.C. §1961(3).

124.    Riggs Bank is an "enterprise" within the meaning of 18 U.S.C. §1961(4). During the

relevant times as described above in this Complaint, this enterprise engaged in, or its activities affected,

interstate and/or foreign commerce.

125.    During the relevant times, Defendants were employed by or associated with the said

enterprise.

126.    During the relevant times, Defendants conducted and participated, directly and

indirectly, in the racketeering activity complained of herein.

127.    The said racketeering activity consisted of two or more incidents of racketeering

conduct engaged in by the RICO defendants.

128.    The racketeering activity, as described in 18 U.S.C. §1961(1), includes but is not

limited to:

a.    Repeated acts of money laundering within the meaning of 18 U.S.C. §

1961(1) and 18 U.S.C. § 1956;

b.    Repeated acts of mail fraud within the meaning of 18 U.S.C. § 1961(1) and

18 U.S.C. § 1341;

c.    Repeated acts of wire fraud within the meaning of 18 U.S.C. § 1343.

129.    These acts of racketeering were interrelated by distinguishing characteristics in that they had the same purpose, results, participants, victims, and methods of commission.

130.    This racketeering activity was a regular way of conducting Defendants' business and was Defendants' way of conducting and participating in the Enterprise.

131.    The racketeering activity was the proximate cause of a decline in value of Riggs National and therefore resulted in injury to Plaintiff's property.

132.    Plaintiff was therefore directly injured by the Defendants in their business and property in an undetermined amount, by reason of Defendants' violations of 18 U.S.C. §1962(c) as described herein, and within the meaning of 18 U.S.C. §1964(c).

## SECOND CLAIM FOR RELIEF

### (18 U.S.C. §1962(a))

133.    Plaintiff repeats and realleges all previous allegations as if set forth herein.

134.    For the purposes of this Claim, the enterprise described above comes within the meaning of 18 U.S.C. §1961(4) and 18 U.S.C. §1962(a).

135.    During the relevant times, Defendants received income derived, directly or indirectly, from the above described patterns of racketeering activity, in which the participated as principals within the meaning of 18 U.S.C. §1962(9). These RICO defendants also used or invested, directly or

31

indirectly, a part of that income or the proceeds of that income to acquire an interest in, or establish, or

operate the said enterprise described above, when the said enterprise was engaged in interstate or

foreign commerce, all within the meaning of 18 U.S.C. §1962(a).

136.     Plaintiff were directly injured by Defendants in their business and property in an

undetermined amount, by reason of Defendants' violations of 18 U.S.C.§1962(a), all within the

meaning of 18 U.S.C. §1962(c)).

### THIRD CLAIM FOR RELIEF

### (18 U.S.C. §1962(d))

137.     Plaintiff repeats and realleges all previous allegations as if set forth herein.

138.     Defendants knowingly agreed and conspired with each other to violate 18 U.S.C.

§1964(c) and 18 U.S.C. §1964(a), and took the acts during the Period described in this Complaint in

furtherance of that conspiracy, all in violation of 18 U.S.C. §1962(d).

139.     As a result of Defendants' violation of 18 U.S.C. §1962(d), Plaintiff and Riggs

shareholders have been injured in their business and property.

### FOURTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

140.     Plaintiff repeats and realleges all previous allegations as if set forth herein.

141.     By reason of the foregoing, the Defendants have breached their fiduciary duties to

Plaintiff or aided and abetted in the breach of those fiduciary duties.

142.     As a result, Plaintiff has been harmed.

### JURY DEMAND

Plaintiff requests a trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief against Defendants and each of them, jointly, severally, or in the alternative, as follows:

Determining that this action is a proper class action and appointing Plaintiff as Lead Plaintiff and its counsel as Lead Counsel for the Class and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

An award in favor of the Class against all Defendants, for the amount of damages and losses sustained by Riggs as a result of Defendants' RICO violations, breaches of their fiduciary duties to Riggs shareholders, and other wrongdoing alleged herein;

Awarding Plaintiff threefold damages, the cost of this action, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1961(1) *et seq.*; and

Awarding Plaintiff such other and further relief as this Court may deem proper and just.

Dated: November ___, 2004

FINKELSTEIN, THOMPSON & LOUGHRAN

By: _____

Donald J. Enright (No. MD013551)
Burton H. Finkelstein (No. 105213)
Foundry Building
1050 30th Street, N.W.
Washington, D.C. 20007

33

Tel:     (202) 337-8000
Fax:     (202) 337-8090

Herbert E. Milstein (No. 26203)
Steven J. Toll (No. 225623)
Adam T. Savett (No. 484254)
COHEN MILSTEIN HAUSFELD
        & TOLL, P.L.L.C
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

*Attorneys for Plaintiff*

Of Counsel:

Laurence D. Paskowitz
PASKOWITZ & ASSOCIATES
60 East 42nd Street
46th Floor
New York, NY 10165
Tel:     (212) 685-0969
Fax:     (212) 685-2306

Arthur J. Salzberg
ARTHUR J. SALZBERG & ASSOCIATES, P.C.
Air Rights Center, North Tower
Suite 601
7315 Wisconsin Avenue
Bethesda, MD 20814
Tel:     (301) 913-0222
Fax:     (301) 913-0246

34