## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FREEPORT PARTNERS, LLC, 201 Trenor Drive, New Rochelle, NY 10804, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH L. ALLBRITTON, ROBERT L. ALLBRITTON, ROBERT ROANE, J. CARTER BEESE, TIMOTHY C. COUGHLIN, LAWRENCE I. HEBERT, and SIMON KARERI.<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.1:04CV02030

Judge Gladys Kessler

**PLAINTIFFS'S AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF RICO STATUTE**

**JURY TRIAL DEMANDED**

Plaintiff Freeport Partners, LLC, by its attorneys, alleges on behalf of itself and all others similarly situated, on information and belief based, *inter alia*, upon the investigation of its counsel, except as to those allegations which pertain to the named Plaintiff or its attorneys, which are alleged on personal information and belief, as follows:

### NATURE OF THE ACTION

1.      This is a RICO class action, seeking recovery of direct economic damages on behalf of shareholders of Riggs National Corporation ("Riggs"), the parent company of Riggs Bank, N.A. ("Riggs Bank"), from certain officers and directors of Riggs and Riggs Bank ("Defendants") for the actions complained of herein.  As more fully detailed below, Defendants engaged in money laundering and in other RICO predicate acts aimed at benefitting both Riggs Bank and Defendants at the expense of the shareholders of Riggs.  The direct consequences of these acts has been to reduce the compensation Riggs shareholders will receive in connection

with an imminent merger between Riggs PNC Financial Services Group ("PNC").  Indeed, the

merger itself was necessitated by, and proximately caused by Defendants' illegal money

laundering, wire fraud, and mail fraud activities detailed herein, which directly and proximately

caused the consideration to be received by the class in connection with the PNC acquisition to be

depressed.  Said actions constitute RICO violations directly harming Plaintiff and other members

of the class in their property.

2.      Defendants' active participation in money laundering and other related wrongful

acts both made the sale of Riggs necessary and reduced the price at which that sale could be

made insofar as that the merger negotiations were both tainted and rendered unfair due to

Defendants' significant incentive to sell Riggs at a reduced value during all relevant periods.

3.      On May 13th, 2004, Riggs Bank was penalized by the Office of the Comptroller of

the Currency and Financial Enforcement Network of the Treasury Department ("FinCEN") for

"willful and systemic" violations by Riggs of its money laundering obligations.

4.      On July 15th, 2004, the Senate Permanent Subcommittee on Investigations (the

"Subcommittee") released a report entitled "Money Laundering and Foreign Corruption:

Enforcement and Effectiveness of the Patriot Act: Case Study Involving Riggs Bank" (the

"Subcommittee Report").  The Subcommittee Report detailed how, since 1997, Defendants

actively used Riggs Bank to facilitate money laundering on behalf of foreign dictator Augusto

Pinochet of Chile ("Pinochet") and various Equatorial Guinea government officials (primarily

President Teodoro Obiang Nguema Mbasango ("President Obiang")), noted Defendants had

likely facilitated the same sort of activity for various Saudi Arabian account holders, and

recounted repeated failings by Defendants to implement legally mandated anti-money laundering

2

protections.

5.      One day after the release of this report, on July 16th, 2004, PNC Financial

Services Group, Inc. ("PNC") agreed to purchase Riggs for approximately $779 million, or at the

time the merger was announced, about $24.25 per share.  In conjunction with this acquisition,

Riggs shareholders would have received a combination of cash and PNC common stock.

6.      This price was a very low valuation of Riggs based on its assets and book value.

7.      On January 27, 2005, Riggs pled guilty to a federal criminal violation of the Bank

Secrecy Act premised on Riggs' ***knowing and willful*** failure to report suspicious transactions,

their failure to report suspicious transactions in a timely manner, and their failure to report

suspicious transactions in an accurate manner.

8.      On February 7, the PNC/Riggs merger agreement collapsed.  PNC released a

press release in the wake of this collapse stating:

> Since July, there have been numerous unexpected adverse developments at
> Riggs, including a criminal plea of guilty by Riggs National Bank. In
> addition to sizeable fines that have been imposed on Riggs, it has faced an
> exorbitant run rate of legal and compliance expenses related to a litany of
> legal and regulatory matters that Riggs continues to face, along with other
> losses. The business and results of operations at Riggs have also suffered
> significant deterioration as illustrated by the recent guidance relating to its
> 2004 loss.

9.      Three days later, PNC and Riggs announced they had come to a merger

agreement for an even more reduced price – $20 per common share, or approximately $652

million.  This represents a $127 million decline from the already depressed original acquisition

price.  This price represents an extremely low valuation of Riggs based on its assets and book

value.

10.     The depressed acquisition price was a direct result of Defendants' money laundering activities and persistent non-compliance with various applicable banking laws. Riggs' shareholders have thus been directly harmed by Defendants' activity.

## JURISDICTION AND VENUE

11.     This action arises under Title IX of the Organized Crime Control Act of 1970 (18 U.S.C. §§ 1961-1968) (the Racketeer Influenced and Corrupt Organization Act) ("RICO").

12.     Jurisdiction over this matter resides in this Court pursuant to 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. § 1367 (supplemental jurisdiction), and 18 U.S.C. §1964(a) and (c) (RICO).

13.     In connection with the acts and conduct alleged, Defendants directly and/or indirectly used means and instrumentalities of interstate commerce including, but not limited to, interstate wire and telephone communications, the United States Mail, and other interstate express carriers.

14.     Venue in this matter is proper in this district court pursuant to 15 U.S.C. §77v(a) and 15 U.S.C. §78aa in that all Defendants are found, are inhabitants of, and/or transact business in this district; and pursuant to 28 U.S.C. §1391(b) in that a substantial part of the actions or omissions giving rise to these claims arose in this district; pursuant to 18 U.S.C. §1965(a) in that all Defendants are found, have an agent, and/or transact their affairs from within the district; and pursuant to 18 U.S.C. §1965(b) in that, with respect to the allegations made, the ends of justice require that all Defendants be brought before this Court.

## THE PARTIES

15.     Plaintiff owned Riggs common stock on July 16, 2004 and on February 10, 2005

and continues to own such stock.

16.     Riggs is a publicly traded bank holding company, incorporated in Delaware and headquartered in Washington, D.C.  Riggs' principal executive offices are located at 1503 Pennsylvania Ave., N.W., Washington, D.C., 20005, and Riggs is listed on the NASDAQ national market under the ticker symbol RIGS.  Riggs Bank, the principal subsidiary of Riggs, is a financial institution incorporated in Delaware and operating throughout the Washington, D.C. metropolitan area.  The Riggs and Riggs Bank Boards of Directors often meet jointly.

17.     The Riggs  Board has an Executive Committee, an Audit Committee, a Compensation Committee, an International Committee, and the Riggs & Co. Committee.  The International Committee establishes and monitors the mission of the International Banking Group of Riggs Bank.  The International Banking Group furnishes a variety of financial services, including issuing letters of credit in connection with trade and other transactions, taking deposits, foreign currency exchange, private banking and cash management. Customers include embassies and foreign missions in Washington, D.C. and elsewhere, foreign governments, central banks, and other banks.  Defendants Joseph Allbritton, J. Carter Beese, Timothy Coughlin, and Lawrence Hebert sat on this committee.

18.     Defendant Simon Kareri was Riggs' senior embassy account manager for the West African nations of Equatorial Guinea (E.G) and Benin until January 2004.   As more fully detailed herein, at various times Kareri physically transported millions of dollars in cash from Equatorial Guinea to be deposited in the bank.  Additionally, Kareri served as sole signatory on accounts used to funnel payments by oil companies doing business in Equatorial Guinea into separate accounts controlled by President Obiang and his family members.  It was a violation of

bank policy to have a single Riggs employee serve as sole signatory on an account, but defendants Robert Allbritton, Lawrence I. Hebert, Timothy Coughlin, and Robert Roane did not object to Kareri so serving when informed he was doing so.

19.     Defendant Joseph Allbritton is a board member who served as a bank director from 1981 until 2004.  Mr. Allbritton was Chairman of the Board of both Riggs and Riggs Bank for many years.  He additionally served as the Chief Executive Officer of both institutions from 1983 - 2000.  Joseph Allbritton is Senior Chairman of the International Committee and therefore is and was in a position to monitor Riggs Banks' relationships with international customers at the time the conduct detailed herein occurred.

20.     As more fully detailed herein, Joseph Allbritton personally courted Pinochet as a Riggs customer, maintained a banking relationship with Pinochet, and helped Pinochet to conceal the source of proceeds of drug trafficking, arms trafficking, and corruption. Joseph Allbritton has settled a criminal case in Spain directly tied to this conduct. Joseph Allbritton also served on a Riggs committee tasked with maintaining professional banking relationships with President Obiang of Equatorial Guinea and, in doing so, helped President Obiang to conceal proceeds reaped from looting the treasury of Equatorial Guinea.  Joseph Allbritton, along with other officers, personally agreed to pay $1 million to victims of Pinochet as part of a settlement in a Spanish court for criminal charges brought against current and former directors and officers of Riggs.

21.     Defendant Robert Allbritton is Joseph Allbritton's son.  In February 2001, the junior Allbritton succeeded his father as Chairman of the Board of Riggs Bank and also became Chairman of the Board and CEO of Riggs National Corporation.  He is also a director of Riggs

Bank Europe Limited, an indirect subsidiary of Riggs.  As such, he was in a position to monitor Riggs Bank's relationships with international customers at the time the conduct detailed herein occurred.  Moreover, Robert Allbritton, along with other officers, personally agreed to pay $1 million to victims of Pinochet as part of a settlement in a Spanish court for criminal charges brought against current and former directors and officers of Riggs.   On March 7, 2005, Robert Allbritton announced that he intends to resign from the board of Riggs.

22.     Defendant J. Carter Beese, Jr., a Riggs director since 2001, is President of Riggs Capital Partners, LLC, and Riggs Capital Partners II, LLC, both of which are venture fund subsidiaries of Riggs.  Beese serves on the International Committee, and as such was in a position to monitor Riggs Bank's relationships with international customers at the time the conduct detailed herein occurred.  As more fully detailed herein, Beese was sent an email on May 2, 2001, from Riggs' Executive Vice President Raymond Lund referring to Riggs' "growing relationship with Equatorial Guinea," and requesting his appearance at a meeting to discuss the "long-term structure of this relationship."  Beese was also privy to discussions concerning Riggs' relationship with Equatorial Guinea.

23.     Defendant Timothy C. Coughlin announced his retirement as president of Riggs in May of 2004.  Coughlin had been a Riggs director since 1988, has been the President of Riggs since 1992 and is a director of J. Bush & Co. Incorporated and Chairman of Riggs Investment Advisors Inc., both indirect subsidiaries of Riggs.  Coughlin serves on the Executive and International Committees, and as such was in a position to monitor Riggs Bank's relationships with international customers at the time the conduct detailed herein occurred.  As more fully detailed herein, Coughlin served on a Riggs committee tasked with maintaining professional

banking relationships with President Obiang of Equatorial Guinea and, in doing so, helped

President Obiang to conceal proceeds reaped from looting the treasury of Equatorial Guinea.

Coughlin was also privy to numerous discussions concerning Riggs' dealings with Equatorial

Guinea.

24.     Defendant Lawrence I. Hebert, a Riggs director since 1988, became a director and

President and Chief Executive Officer of Riggs Bank in February 2001.  In addition, he is a

director of Riggs Investment Advisors, Inc., and Riggs Bank Europe Limited, both of which are

Riggs' indirect subsidiaries.  Hebert serves on the Executive and International committees, and

as such was in a position to monitor Riggs Bank's relationships with international customers at

the time the conduct detailed herein occurred.  As more fully detailed herein, Hebert also served

on a Riggs committee tasked with maintaining professional banking relationships with President

Obiang of Equatorial Guinea and, in doing so, helped President Obiang to conceal proceeds

reaped from looting the treasury of Equatorial Guinea.  Moreover, Hebert was privy to numerous

discussions concerning Riggs' dealings with Equatorial Guinea.

25.     Defendant Robert Roane was a member of the Riggs Bank Board of Directors at

the time the challenged conduct occurred.  As more fully detailed herein, Roane was privy to

numerous discussions concerning Riggs' dealings with Pinochet and with Equatorial Guinea.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of all shareholders of Riggs who owned stock on either July 16, 2004 or

February 10, 2005.  Excluded from the Class are the Defendants, officers and directors of Riggs

or Riggs Bank, members of their immediate families and their legal representatives, heirs,

successors or assigns and any entity in which any of the Defendants have or had a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

28.     As of January 31, 2004, Riggs had 1,749 shareholders of record, substantially all of whom would be members of the Class.  As of October 29, 2004, Riggs had more than 31.61 million shares outstanding.

29.     Plaintiff's claims are typical of the claims of members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.* they were injured in their property as a result of Defendants' RICO violations.

30.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

31.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation.

32.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class Members include:

> a.     Whether the Defendants violated, inter alia, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*;
>
> b.     Whether the Class has been damaged and, if so, the extent of such damages and/or the nature of the equitable relief, statutory damages, or

exemplary damages which the Class is entitled to plead and prove; and

c.      Whether the acquisition price of Riggs was depressed as a result of
Defendant's actions and, if so, to what extent.

32.      A class action is a superior method for the fair and efficient adjudication of the
controversy in that, among other things, such treatment will permit a large number of similarly
situated persons to prosecute their common claims in a single forum simultaneously, efficiently,
and without the unnecessary duplication of evidence, effort, and expense that numerous
individual actions would engender.  The benefits of proceeding through the class mechanism,
including providing injured persons or entities with a method for obtaining redress on claims
that it might not be practicable to pursue individually, substantially outweigh any difficulties
that may arise in management of this class action.

33.      Plaintiff knows of no difficulty to be encountered in the maintenance of this
action that would preclude its maintenance as a class action.

## FACTUAL ALLEGATIONS

### A.      Failure to Comply with Federal Anti-Money Laundering Laws:

34.      Both the Bank Secrecy Act (31 U.S.C. §§ 5311 *et seq.*) and the USA Patriot Act
of 2001 (Pub.L. No. 107-56, 115 Stat. 272 (2001))  require banks to implement anti-money
laundering programs.

35.      The elements of an effective anti-money laundering program for banking
institutions are well established.  The Federal Reserve has published detailed guidelines on the
implementation of such programs for private banking institutions.  These guidelines recommend
banks develop written anti-money laundering procedures, including, *inter alia*, so-called

10

"know-your-customer" policies and procedures and further recommend that banks perform careful due diligence reviews before accepting new clients, involving compiling basic background information on each client for whom an account is opened including the client's name, address, form of identification, business, source of wealth, and the type and volume of transactions expected to pass through clients' accounts.

36.    Additionally, the Bank Secrecy Act and the regulations promulgated thereunder, specifically 12 C.F.R. §§208.62(h) and (i), also impose direct obligations on the director defendants to assure the timely filing of Suspicious Activity Reports[1] - key enforcement and compliance tools against money laundering and suspicious offshore activity.

37.    From 1997 to 2004, Riggs Bank has repeatedly been cited by the Office of the Comptroller of Currency ("OCC") and by their own auditors for having weak anti-money laundering controls.

38.    In 2002 and 2003, Riggs Bank was the subject of media reports about questionable transactions and accounts involving officials from Saudi Arabia and Equatorial Guinea.  In response, the OCC initiated intensive examinations of various Riggs accounts.

39.    One investigation, conducted by the Minority Staff of the Senate Committee on Government Affairs' Permanent Subcommittee on Investigations, focused on Riggs' handling of accounts for Augusto Pinochet and Equatorial Guinea and resulted in the Subcommittee Report.

40.    Another investigation, conducted by the full Senate Committee on Government

---

[1] Federal banking regulations require the filing of Suspicious Activity Reports with the appropriate Federal law enforcement agencies and the Department of the Treasury under certain circumstances, as set forth in 12 C.F.R. § 208.62(c).

Affairs, focused on accounts opened by Riggs for Saudi Arabian officials.  This investigation is still ongoing.

41.     On July 16, 2003, Riggs Bank entered into a Stipulation and Consent to the Issuance of a Consent Order and a Consent Order (collectively, the "Consent Order") with the OCC.  The Consent Order required Riggs Bank to take various actions to ensure compliance and improve the monitoring of compliance with the Bank Secrecy Act ("BSA"), requiring in relevant part that banks report cash transactions of $10,000 or more, and related rules and regulations.  The Consent Order allows the OCC to take future actions it deems necessary, including the imposition of a monetary penalty.

42.     On March 2, 2004, the OCC advised Riggs Bank that it was considering whether to institute a civil money penalty action against Riggs Bank and that such action would be based upon the OCC's allegations that Riggs Bank violated the BSA and related rules and regulations, failed to comply with the Consent Order, and failed to implement adequate controls to ensure that Riggs Bank operates in a safe and sound manner with respect to BSA matters.  The OCC informed Riggs Bank that it might seek unspecified modifications to the Consent Order or an additional consent order.  Many of the regulatory violations alleged by the OCC predate the Consent Order.

43.     The OCC also informed Riggs Bank that it was considering whether to subject Riggs Bank to increased regulatory supervision and operational restrictions.  In particular, the OCC advised Riggs Bank that primarily as a direct result of its BSA violations, that it expects to designate Riggs Bank as being in a "troubled condition."  A bank that is classified as being in a "troubled condition" must have any new director or executive officer approved in advance by

12

the OCC and is subject, along with its holding company, to a prohibition on making severance payments to directors, officers, and employees under the FDIC's "golden parachute rules."  The increased regulatory supervision is expected to result in more frequent and intensive examinations.

44.     Also on March 2, 2004, Riggs Bank was advised by FinCEN that it was evaluating whether it is appropriate for FinCEN to assess a civil monetary penalty and/or take additional enforcement action against Riggs Bank for apparent *willful* violations of BSA and related rules and regulations.  FinCEN generally characterized its concerns as: (1) failure by Riggs Bank to establish and implement an adequate anti-money laundering program; (2) failure by Riggs Bank to properly prepare and file Suspicious Activity Reports; and (3) failure by Riggs Bank to file accurate Currency Transaction Reports.[2]

45.     In May 2004, the OCC and FinCEN cited Riggs for failing to file Currency Transaction and Suspicious Activity Reports, for willfully violating its legal obligations to implement an adequate anti-money laundering program, and for failing to comply with the consent order.

46.     On July 15th, 2004, the Subcommittee Report was released.  The Subcommittee Report specifically identified deficiencies in Riggs Bank's anti-money laundering efforts, including:

      a.     Usage of an information system unable to identify all the accounts opened for a single client, thereby impeding efficient oversight;

---

[2] Most financial institutions, including Riggs Bank, are required, pursuant to 31 C.F.R. § 103.22, to file Currency Transaction Reports on IRS Form 4789 for any transaction (cash in or cash out) in currency over $10,000.

b. Lack of a system for identifying which of its clients had low, medium, or high money laundering risks;

c. Poor "know-your-customer" documentation for international private banking clients and Embassy accounts;

d. Lack of an effective system for identifying and monitoring accounts opened by political figures;

e. Failing to conduct routine monitoring of any of its high risk accounts;

f. Failing to oversee clients' wire transfer activity to identify specific transactions;

g. Failing to implement an effective procedure for filing the Suspicious Activity Reports required by the Bank Secrecy Act;

h. Lack of an efficient system for alerting its personnel to the bank's receipt of a subpoena requesting information about a particular account;

i. Laxity of the banks' internal audit department;

j. Failing to provide adequate anti-money laundering training for its employees;

k. Lack of an effective system for supervising its account managers; and

l. Failing to act on regulators' directives to improve the banks' anti-money laundering program.

47. News reports indicate that Riggs Bank investigators have found evidence of possible criminal activities by some former Riggs employees and have referred that evidence to the Departments of Justice.   As set forth in detail herein, Defendants had an active role in the

money laundering Riggs Bank facilitated.

48.     Riggs Bank is also the subject of criminal investigations by the U.S. Attorney's

Office for the District of Columbia and the United States Department of Justice.

## B.     Equatorial Guinea

49.     Equatorial Guinea is a West African country, ruled since 1979 by President

Obiang.  Elections in Equatorial Guinea have been described by the United States State

Department as "marred by extensive fraud and intimidation."  The State Department has also

been highly critical of the country's human rights abuses, use of torture, and culture of

corruption, and the International Monetary Fund has been critical of the country's lack of

transparency and accountability on fiscal matters.

50.     Indeed, an analysis ***prepared by Riggs*** in connection with a 2002 Equatorial

Guinea loan request noted the following:

> The World Bank and IMF are under pressure to engage with Equatorial Guinea ....
> Although the government recently announced a program to improve transparency and
> accountability, any changes are unlikely to meet IMF criteria. With the establishment
> of a state oil company, GE Petrol, later in 2001, management of the oil sector may
> even become more opaque, and ***standards of governance are like[ly] to remain
> poor***. ... The government cash-flow situation improved considerably during
> 1999-2000, reflecting growing oil revenue, but ***fiscal policy performance continued
> to weaken, as evidenced by the lack of control over government financial
> operations*** . . . . Allegations of human rights abuses following the announcement of
> the coup in March have been well documented, and have elicited international
> condemnation . . . . Human rights have been an endemic problem in Equatorial
> Guinea. The UN Human Rights Commission voted to keep Equatorial Guinea under
> scrutiny however; it is believed that ***the government's increasing capacity to buy
> diplomatic influence*** has caused several African countries to insist on softening the
> criticism. (emphasis added).

This pragmatic assessment of corruption and human rights abuses demonstrate that Riggs

was fully aware of the corruption endemic to the E.G. accounts.

51.     Moreover, the December 6, 2002 Los Angeles Times noted the following:

U.S. relations with Equatorial Guinea have long ranged from cool to outright chilly. In 1993, U.S. Ambassador John Bennett received a death threat in an anonymous note sent, he believed, by a high-ranking official in Obiang's government. Two years later the Clinton administration closed the U.S. Embassy in Malabo, the capital.

There has been little ground for improved ties since then. ***The country's human rights record is still considered abysmal and much of Equatorial Guinea's new oil wealth appears to be finding its way into the pockets of the president and his cronies. In 2000, Obiang bought two mansions in the Maryland suburbs outside of Washington. The bigger estate cost $2.6 million and has 10 bathrooms, seven fireplaces and a 3,500-square-foot club room.***

52.     Nevertheless, Defendants either assisted or caused the Bank to assist President Obiang in looting Equatorial Guinea public treasury, allowing President Obiang to channel hundreds of millions of dollars through Riggs Bank and into President Obiang's personal accounts.  This was "an offense against a foreign nation," involving the "misappropriation, theft, or embezzlement of public funds by or for the benefit of public official." within the meaning of 28 U.S.C. 1956(7)(B).

53.     President Obiang, as more fully detailed herein, also relied on Defendants to help him conceal the origins of bribes paid to him by Western oil companies.

54.     During a Senate hearing on July 15, 2004 concerning the Riggs matter, U.S. Senator Carl Levin noted when questioning defendant Hebert that President Obiang was "looting his own treasury for personal use" according to the U.S. State Department and further noted that Riggs made "no effort to find out when all these millions of dollars are transferred out of these government accounts into private accounts and to companies and offshore entities that you helped set up that can't be tracked."

16

55.     Equatorial Guinea opened their first accounts with Riggs Bank in 1995.  Overall, Riggs Bank managed more that 60 accounts and certificates of deposit ("CDs") for Equatorial Guinea, its officials, and their family members.  In doing so, they facilitated numerous suspicious transactions without notifying law enforcement, paid little or no attention to the bank's anti-money laundering obligations, and willfully disregarded evidence suggesting the bank was handling the proceeds of foreign corruption.

56.     Equatorial Guinea eventually became the largest single relationship in Riggs Bank.  Equatorial Guinea's account manager – defendant Simon Kareri – sent top Riggs Bank officials, including Defendants, periodic memoranda concerning developments related to Equatorial Guinea accounts.

57.     Of the 60 accounts and CDs opened for Equatorial Guinea clients at Riggs Bank, at least half functioned as private banking accounts for senior Equatorial Guinea officials or their family members.

58.     Riggs Bank also helped President Obiang and his sons establish at least two offshore shell corporations and open bank accounts in their names.  These corporations were Otong, S.A. and Awake, Ltd., both offshore corporations incorporated in the Bahamas.

59.     The accounts Riggs Bank opened for Equatorial Guinea included:

a.     E.G. Oil Account: A standard business checking account March 11, 2005in the name of "Republica de Guinea Ecuatorial-Tesoreria General," primarily used to hold proceeds from various oil companies doing business in Equatorial Guinea.

b.     E.G. Investment Accounts: Riggs had a standard money market account

liked to two Riggs investment accounts.

c.      Other E.G. Government Accounts: Various other accounts and CDs were also opened in the name of the Republic of Equatorial Guinea.

d.      E.G. Embassy Accounts: Eight accounts were opened at Riggs in the name of the "Embassy of Equatorial Guinea."

e.      E.G. Student Accounts: Two accounts were opened in the name of Equatorial Guinea government and used to pay the expenses of students studying in the United States.

f.      Otong Accounts: One account and two CDs were opened in the name of Otong S.A.  President Obiang was the beneficial owner of both the account and the CDs.

g.      Constancia Nsue Accounts: Five accounts and three CDs were opened in the name of Constancia Mangue Nsue (President Obiang's wife), both as a sole and joint owner.

h.      Teodoro Nguema Obiang Accounts: Teodoro Nguema Obiang (President Obiang's son) was the beneficial owner of three accounts opened in the name of TNO Entertainment LLC and Awake, Ltd. - both companies he controlled.

i.      Teodoro Biyogo Nsue and Elena Mensa Accounts: Several accounts were opened for Teodoro Biyogo Nsue (Equatorial Guinea's Ambassador to the United States) and his family.

j.      Melchor Edjo Accounts: One account and two CDs were opened in the name of Melchor Esono Edjo, Secretary of State for Treasury and Budget in

Equatorial Guinea.

k.      Armengol Ondo Ngumea Accounts: One account and one CD were opened in the name of Armengol Ondo Nguema, President Obiang's brother and the Director of National Security in Equatorial Guinea.

l.      Pastor Micha Ondo Bile Accounts: Two accounts and four CDs were opened in the name of Pastor Micha Ondo Bile, Minister of Foreign Affairs in Equatorial Guinea.

m.      Boriko, Nseng, and Edjo Accounts: Three separate accounts were opened for Miguel Abia Biteo Boriko, former Minister of the Economy in Equatorial Guinea, Juan Olo Mba Nseng, former Minister of Mining and now Director of Electricity in Equatorial Guinea, and Baltasar Engongo Edjo, Minister of Economic Affairs and Finance.

n.      Makina Accounts. Three accounts with minor balances were opened in the name of Sisinio E Mbana Makina, the former First Secretary of Equatorial Guinea who was employed at  Equatorial Guinea's embassy.

o.      Business Accounts. Three accounts were opened in the name of Equatorial Guinea businesses. Ecuato Guineana de Aviacion, one of Equatorial Guinea's two national airlines, opened one money market account at Riggs in 2001.  GEPetrol,  Equatorial Guinea's state oil company, opened a corporate wholesale checking account and a business money market account.

60.      On repeated occasions, Riggs Bank facilitated large cash transactions involving Equatorial Guinea accounts under suspicious circumstances.

19

61.     On six occasions between 2000 and 2002, Riggs Bank accepted *cash* deposits of $1 million or more into the Otong account, for a total of $11.5 million.  These transfers included:

| | |
|---|---|
| April 20, 2000 | $1.0 million cash deposit |
| March 8, 2001 | $1.0 million cash deposit |
| March 20, 2001 | $1.5 million cash deposit |
| Sept. 5, 2001 | $2.0 million cash deposit |
| Sept. 17, 2001 | $3.0 million cash deposit |
| April 12, 2002 | $3.0 million cash deposit |

62.     On at least two occasions, the cash for these deposits was brought into the bank in suitcases transported by Defendant Simon Kareri, who indicated that he had received the cash from senior Equatorial Guinea officials such as President Obiang or the Ambassador.   On various occasions, Mr. Kareri gave inconsistent explanations for the source of this cash.

63.     The explanation Mr. Kareri gave the OCC was that President Obiang had closed certain bank accounts in Europe and maintained the funds – totaling *millions* of dollars – in cash so as to avoid phone calls from marketers looking for reinvestment opportunities.

64.     Additionally, two separate internal Riggs memoranda authored by Mr. Kareri indicated the cash represented the proceeds of the sale of properties in Spain and in France.   It is unclear if Mr. Kareri provided any explanation why the proceeds of these sales would have been in the form of suitcases filled with cash.

65.     Riggs Bank did not decline to complete any of the transactions, nor did they identify or report any of them as suspicious activity.  Indeed, a Riggs employee indicated that these large cash deposits "were not treated as unusual or requiring additional scrutiny."

66.     Thus, it is clear that, Defendant Kareri repeatedly made extraordinarily large cash deposits under extraordinarily odd circumstances into the accounts of an offshore shell

corporation controlled by President Obiang (a man noted for corruption) and provided

inconsistent explanations for the source of these funds.  Nevertheless, Riggs treated these

transactions as normal.

67.     Moreover, the Currency Transaction Reports Riggs Bank filed in connection

with these transactions misrepresented the nature and purpose of Otong, S.A.

68.     Those reports did not disclose that Otong, S.A. was an offshore corporation

controlled by President Obiang.  Rather, they asserted that Obiang, S.A. was an exporter of

timber.

69.     Large cash deposits were also made on repeated occasions to a Constancia Nsue

account, totaling $495,875. These included:

| | |
|---|---|
| Jan. 24, 2000 | $150,000.00 cash deposit |
| Feb. 1, 2000 | $ 20,000.00 cash deposit |
| Sept. 5, 2000 | $ 25,000.00 cash deposit |
| Sept. 13, 2000 | $ 50,000.00 cash deposit |
| March 8, 2001 | $ 50,875.00 cash deposit |
| March 8, 2001 | $100,000.00 cash deposit |
| Sept. 17, 2001 | $100,000.00 cash deposit |

70.     This account also had numerous foreign currency transactions allegedly

involving checks written in Euros being converted into U.S. dollars by the bank before

depositing the dollars into the Constancia Nsue account, some of which were marked by Riggs

Bank as "cash deposits."  When asked by the OCC for copies of the Euro checks, Riggs Bank

failed in some cases to produce any copies.  These transactions totaled $3,126,652.20 and

included:

| | | |
|---|---|---|
| Sept. 20, 1999 | $114,134.71 | deposit |
| Nov. 19, 1999 | $201,382.86 | deposit |
| March 30, 2000 | $425,235.12 | deposit |
| July 11, 2000 | $494,811.32 | deposit |

21

|  |  |  |
|---|---|---|
| Jan. 16, 2001 | $156,491.39 | deposit |
| March 8, 2001 | $104,417.33 | deposit |
| May 8, 2001 | $274,762.41 | deposit |
| July 25, 2001 | $ 56,632.56 | deposit |
| Oct. 1, 2001 | $223,836.99 | deposit |
| Nov. 15, 2001 | $ 64,068.46 | deposit |
| Jan. 15, 2002 | $413, 337.15 | deposit |
| April 6, 2002 | $ 58,421.24 | deposit |
| April 12, 2002 | $231,618.22 | deposit |
| Aug. 26, 2002 | $168,066.49 | deposit |
| Nov. 13, 2002 | $139,435.95 | deposit |

71.     A joint Constancia Nsue account also received large cash payments totaling

$934,209, four of which took place on the same days as the cash payments recounted in ¶ 60.

These included:

|  |  |
|---|---|
| Jan. 24, 2000 | $ 50,000.00 cash deposit |
| Feb. 1, 2000 | $ 70,000.00 cash deposit |
| Feb. 4, 2000 | $ 20,000.00 cash deposit |
| Sept. 5, 2000 | $300,000.00 cash deposit |
| March 16, 2001 | $200,000.00 cash deposit |
| March 20, 2001 | $ 80,000.00 cash deposit |
| Sept. 17, 2001 | $ 20,000.00 cash deposit |
| Feb. 8, 2002 | $100,000.00 cash deposit |
| Sept. 5, 2002 | $ 20,000.00 cash deposit |
| Dec. 23, 2002 | $ 74,209.00 cash deposit |

72.     Riggs Bank therefore enabled President Obiang and his wife to make at least $13

million in *cash* deposits into their Riggs Bank accounts over a three year period.

73.     Riggs Bank failed to file a single Suspicious Activity Report despite the size of

the transfers, the fact that Constancia Nsue was depositing millions of dollars in cash into her

personal accounts, and the fact that President Obiang was depositing millions of dollars in cash

into his offshore Riggs Bank accounts.

74.     Riggs Bank also facilitated numerous wire transfers by Equatorial Guinea

involving frequent and sizeable transfers of funds across international lines.

75.     From June 2000 to December 2003, sixteen wire transfers were sent from the

E.G. Oil Account held at Riggs Bank to Kalunga Company SA, an Equatorial Guinea

corporation, totaling over $26.5 million.  All of these transfers were sent from Riggs Bank to a

Kalunga Company account at Banco Santander in Madrid, Spain. These transfers included:

| | |
|---|---|
| June 7, 2000 | $1,332,044.00 wire transfer |
| Aug. 10, 2000 | $1,110,000.00wire transfer |
| Sept. 5, 2000 | $ 292,200.00 wire transfer |
| Oct. 16, 2000 | $1,362,500.00 wire transfer |
| Jan. 30, 2001 | $2,698,800.00 wire transfer |
| April 10, 2001 | $1,349,400.00 wire transfer |
| May 9, 2001 | $1,349,400.00 wire transfer |
| May 7, 2002 | $ 798,000.00 wire transfer |
| June 26, 2002 | $ 167,000.00 wire transfer |
| Oct. 31, 2002 | $ 336,934.57 wire transfer |
| April 7, 2003 | $7,425,000.00 wire transfer |
| July 24, 2003 | $ 770,567.00 wire transfer |
| Sept. 3, 2003 | $ 335,137.00 wire transfer |
| Nov. 21, 2003 | $4,800,000.00 wire transfer |
| Dec. 11, 2003 | $1,637,000.00 wire transfer |
| Dec. 11, 2003 | $ 720,000.00 wire transfer |

76.     From July 2000 to November 2001, ten wire transfers were sent from the E.G.

Oil Account held at Riggs Bank to Apex Trading Ltd., totaling $8.1 million.  Nine of these were

sent to an Apexside account a Credit Commercial de France in Luxembourg and one was sent to

an Apexside account at HSBC in Luxembourg. These transfers included:

| | |
|---|---|
| July 10, 2000 | $ 697,400.00 wire transfer |
| Aug. 28, 2000 | $1,096,800.00 wire transfer |
| Oct, 16, 2000 | $1,561,587.30 wire transfer |
| Jan. 10, 2001 | $ 538,953.00 wire transfer |
| April 10, 2001 | $2,127,385.00 wire transfer |
| May 30, 2001 | $ 45,580.00 wire transfer |
| July 18, 2001 | $ 246,707.05 wire transfer |
| July 25, 2001 | $ 167,304.76 wire transfer |
| Aug. 2, 2001 | $1,233,835.00 wire transfer |
| Aug. 22, 2001 | $ 389,939.83 wire transfer |

77.     Three wire transfers over an eight month period were sent from the E.G. Oil Account held at Riggs Bank to Jadini Holdings, Ltd. at a bank account in Virginia.  Jadini Holdings is an offshore shell corporation owned by the wife of Defendant Simon Kareri.  These transfers totaled just over one million and included:

| | |
|---|---|
| July 5, 2001 | $ 700,000.00 wire transfer |
| July 5, 2001 | $ 329,926.00 wire transfer |
| March 20, 2002 | $ 66,751.78 wire transfer |

78.     Three transfers went from the E.G. Oil Account held at Riggs Bank to personal accounts controlled by Equatorial Guinea's Secretary of State for Treasury and Budget, Melchor Esono Edjo.  These accounts totaled $499,000 and included:

| | |
|---|---|
| March 13, 1998 | $ 122,000.00 wire transfer |
| May 27, 1998 | $ 122,000.00 wire transfer |
| June 12, 2002 | $ 255,000.00 wire transfer |

79.     Riggs Bank failed to identify any of these transactions as suspicious at the time they occurred and failed to question any of the transfers until the Subcommittee and OCC began their investigations.

80.     Riggs Bank also provided Equatorial Guinea with other banking services.  This included providing Equatorial Guinea clients with a variety of credit arrangements addressing governmental and Embassy concerns as well as individual officials' needs, managing two Riggs Bank accounts used to provide educational funding for Equatorial Guinea students (funded by oil companies and primarily benefitting the children of wealthy or powerful Equatorial Guinea officials), and other questionable services related to procurement matters and financial advice

81.     Riggs Bank also aided and abetted numerous oil companies in committing violations of the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.*, which criminalizes

illicit payments to foreign public officials by U.S. businesses and individuals.

82.     The Subcommittee Report noted that "[o]il companies operating in Equatorial Guinea may have contributed to corrupt practices in that country by making substantial payments to, or entering into formal business ventures with individual E.G. officials, their family members, or the entities they control, with minimal public disclosure of their actions." These actions may constitute severe violations of the Foreign Corrupt Practices Act.

83.     Moreover, Riggs funneled these payments through their accounts in a fashion designed to channel them to President Obiang and other government officials while obscuring their origins.

84.     The circumstances surrounding these payments are, to say the least, suspicious. In one instance, the Hess oil company paid more that $450,000 over four years to a *14-year old relative* of President Obiang to rent office space.

85.     A sample of other transactions, drawn from the exhibits to the Subcommittee Report, follows:

| Oil Company | Transaction | Amount | Recipient |
| --- | --- | --- | --- |
| ChevronTexaco | Support to EG Students | $150,000/yr | E.G. Student Accounts |
| Devon | Support to E.G. Students | $350,000 | E.G. Student Accounts |
| ExxonMobil | Joint Business Venture (Oil Distribution Company) | 15% Ownership Share | Company Owned by President Obiang (unidentified in report) |
| ExxonMobil | Land Lease | $366,000 | Constancia Mangue Nsue (President Obiang's wife) |

| | | | |
|---|---|---|---|
| ExxonMobil & Hess | Security Services | $1,000,000 | Company Owned by E.G. President's brother |
| Hess | Building Leases | $1,600,000 | E.G. officials and their relatives |
| Marathon | Joint Business Venture (Methanol Plant) | 10% ownership share | Company controlled by E.G. President |
| Marathon | Joint Business Venture (Liquid Petroleum Gas Facility) | 20% ownership share | Company controlled by President Obiang (unidentified in report) |
| Marathon | Land Purchase | $2,000,000 | President Obiang |
| Vanco | Support to E.G. Students | $350,000 | E.G. Student Accounts |

86.     At least four of these companies are currently being probed by the Securities and Exchange Commission for these actions.  These companies include Exxon Mobil Corporation, Marathon Oil Corporation, Amerada Hess Corporation, and ChevronTexaco Corporation.

87.     These substantial payments were made through Riggs Bank.  Riggs Bank additionally allowed President Obiang to siphon millions of dollars from Equatorial Guinea's oil account to his personal account.  None of these transfers were reported as required by 12 C.F.R. §§ 208.62 (h) & (i).

88.     Riggs Bank accordingly aided and abetted the aforementioned oil companies in their violations of the Foreign Corrupt Practices Act and laundered the money collected as a result of those violations.

89.     Riggs Bank failed to cooperate when the Subcommittee commenced its

investigation, initially identifying only about half of Equatorial Guinea's accounts at the bank and producing limited account documentation and electronic mail regarding those accounts.

90.     Additionally, Riggs failed to undertake a detailed internal review of Riggs Bank accounts until late 2003, despite having received a subpoena from the Subcommittee in March 2003.

91.     Riggs Bank did not close Equatorial Guinea's accounts until June and July of 2004.

92.     While Defendant Kareri's physical transportation of cash, detailed above, is certainly the most dramatic example of money laundering in connection with Equatorial Guinea accounts, the individual Defendants also played a distinct role in the management of these accounts.

93.     On May 2, 2001, defendants Robert Roane, J. Carter Beese, Lawrence Hebert, and Simon Kareri, along with others (unidentifiable from available documents) were sent or cc'd an email from Ray Lund, executive vice president of Riggs. This email read:

> Larry has asked that I convene a meeting next week (or the following) to discuss our growing relationship with Equatorial Guinea.  As many of you know, Equatorial Guinea has gone from being a very small, insignificant relationship to the largest single deposit relationship at Riggs ($180MM). They also have $20MM invested with RICO.  And they are expecting to receive at least $20MM a month into their account at Riggs for the forseeable future – Where is this money coming from? Oil – black gold – Texas tea! It's coming from Mobile [sic] and one or two others directly to Riggs.
>
> We need to continue thinking about the long-term structure of this relationship and your thoughts on this matter (and attendance at this meeting)would be greatly appreciated.

94.     Defendants Robert L. Allbritton, Lawrence L. Hebert, Timothy C. Coughlin, and

Simon Kareri sat on a special Riggs Bank committee which met regularly to discuss and

manage Equatorial Guinea's accounts.  These Defendants were all signatories on a May 17,

2001 letter to President Obiang reading as follows:

> We hope this letter finds you well and rested after your last busy trip to
> Washinton.  We would like to thank you for the opportunity you granted to us in
> hosting a luncheon in your honor here at Riggs Bank.  We sincerely enjoyed the
> discussions and especially learning about the developments taking place in
> Equatorial Guinea.
>
> Mre. President we would also like to report to you the developments
> here at Riggs Bank since our meeting.  Following your request for us to serve as
> Financial Advisors to you and the Government of Equatorial Guinea, ***we have
> formed a committee of the most-senior officers of Riggs Bank that will meet
> regularly to discuss our relationship with Equatorial Guinea and how best we
> can serve you***.  This committee, ***which includes the undersigned***, has held its
> first meeting and requests that you provide us with any projects what you would
> like us to review on your behalf and make suggestions.  A list of the planned
> Government projects would be most helpful.
>
> The Riggs Bank relationship with you and your Government is based on
> respect for you and our ability to anticipate and fulfill your requirements.  We
> are confident that we can be of great assistance to you by providing you access
> to the best financial expertise both at Riggs and within the entire financial
> services industry for positive contributions to the development of Equatorial
> Guinea.
>
> We believe that our relationship offers a significant opportunity to
> provide sound financial counseling that will directly benefit the citizens of
> Equatorial Guinea.  We are also confident that together we can reinforce your
> reputation for prudent leadership and administration as you lead Equatorial
> Guinea into a successful future. (emphasis added)

95.     Defendants Joseph L. Allbritton, J. Carter Beese, Timothy C. Coughlin,

Lawrence I. Hebert, and Simon Kareri were all present at a July 11, 2001 meeting of the Riggs'

International Committee where Riggs' business with Equatorial Guinea were discussed.  At this

meeting, Defendant Kareri presented a profile of the government and history of Equatorial

Guinea and further outlined the history of Riggs' dealings with the country.  The minutes from that meeting indicated that "Riggs is the sole banker of the Government of Equatorial Guinea, maintaining close contacts with government officials, and has recently taken over the scholarship payments for students from Equatorial Guinea."  These latter payments were a means by which Riggs laundered money for Equatorial Guinea.  The minutes further noted that Mr. Kareri "provided additional details regarding the deposit and investment accounts, Riggs' fees, and future potential business, including Debt Management Services, a capital markets debt issuance, OPIC financing for a private telephone company, and creation of a 'Fund for the Future.'  The Committee discussed other ways Riggs might assist Equatorial Guinea in terms of over seas education."

96.     On or about June 2001, Defendant Kareri sent Defendant Robert Allbritton, Defendant Lawrence Hebert and six other senior Riggs officials a memorandum describing a week-long business trip to Equatorial Guinea, from May 20 to May 28, 2001. The memorandum spelled out, day-by-day, which E.G. officials he met with and what was discussed. At one point during that trip, the E.G. account manager delivered to the E.G. President a personal letter from one of the Riggs Board members, Frederick J. Ryan, Jr., inviting the E.G. President to visit the Ronald Reagan Library in California.

97.     In response to a December 6, 2002, L.A. Times article noting that "Equatorial Guinea is headed by an embarrassingly corrupt government with a notorious human rights record," and that "much of Equatorial Guinea's new oil wealth appears to be finding its way into the pockets of the president and his cronies," defendant Simon Kareri wrote a memorandum to Lawrence I. Hebert on December 12, 2002 decrying the author of this article and taking issue

with the allegations made therein.  This memorandum demonstrates Kareri and Hebert were keenly aware of the widely-publicized allegations of corruption in Equatorial Guinea's government.

98.     On or about June 26, 2002, Defendant Simon Kareri wrote a memorandum to defendants Robert L. Allbritton and Lawrence I. Hebert and cc'd to defendants Tim Coughlin and Robert Roane entitled "Equatorial Guinea Update" and providing a summary of banking activity within Equatorial Guinea's accounts.  This memorandum provided specific data on the growth in E.G. accounts during the first half of 2002, stating that "the relationship has simply grown by 52.75% to $408.1 million." It continued: "We have established four more Government accounts for a total of eight excluding the Embassy . . .This fits quite well with our strategy to enhance and deepen the relationship with the Government." The memorandum also discussed oil discoveries, housing construction, and a new account for E.G. student scholarships.

99.     This memorandum also announced that Equatorial Guinea's government had appointed Defendant Kareri to be the "sole signatory" of a fund to manage E.G. scholarships. This account was one of the E.G. student accounts (named "Republica de Guinea Ecuatorial-Fondo Especial Para Becas.") primarily funded by oil companies doing business in Equatorial Guinea and primary benefitting the children of Equatorial Guinea government officials.  Riggs has indicated that it was against bank procedure to have a single Riggs employee serve as sole signatory on an account.  Nevertheless, Defendants Robert Allbritton, Lawrence I. Hebert, Timothy Coughlin, and Robert Roane took no action to stop defendant Kareri from serving as the sole signatory on an account which appears to have been used to

launder bribes to Equatorial Guinea officials.

100.    Defendant Robert Roane was written a memorandum by Ray Lund on January 17, 2003, outlining what individuals from Equatorial Guinea with relationships to President Obiang bank with Riggs Bank and describing the details of each account.[3]

### C.    Augusto Pinochet

101.    Augusto Pinochet Ugarte was president of Chile from 1973 - 1990, and was Commander in Chief of the Chilean army until 1998. Pinochet was sworn in as a Chilean Senator-for-Life following the end of his tenure as Army Commander.  Pinochet has been accused of involvement with human rights abuses, torture, assassinations, death squads, drug trafficking, arms sales, and corruption.  He has been the subject of repeated litigation in Spain, the United Kingdom, Chile, and other countries.

102.    Riggs Bank served as a banker to Pinochet for at least eight years, beginning in 1994.  This was the result of efforts by senior Riggs Bank officials to actively seek Pinochet's business, including a trip by a delegation of Riggs Bank officials (reportedly including Defendants Joseph Allbritton and Timothy Coughlin) to meet with Pinochet and ask him to open an account with Riggs Bank.

103.    As stated by Senator Carl Levin during the hearings on the Subcommittee Report: "In 1994, top Riggs officials traveled to Chile and asked General Pinochet, a notorious

---

[3]        This same memorandum also notes that "[t]he Sissoko event took place sometime between 1996 and 1997."  This is a reference to one of defendant Kareri's past private banking clients -- Foutanga Dit Babani Sissoko, a Mali businessman who was subsequently accused of embezzling nearly $250 million from the Dubai Islamic Bank and funneling it through U.S. and European financial institutions.  Kareri opened a Riggs account for Sissoko in 1997, when Sissoko was under house arrest in Miami after having pleaded guilty to attempting to bribe a U.S. customs agent. Sissoko wanted to conceal his control over the account, ran millions of dollars through it and regularly had a representative stuff large withdrawals into a suitcase or his pockets.

military leader accused of involvement with death squads, corruption, arms sales, and drug trafficking, if he would like to open an account at Riggs Bank here in Washington.  Mr. Pinochet said yes."

104.    Pinochet's income, officially acknowledged, never totaled more than $40,000 annually.  Nevertheless, Riggs's holding for Pinochet totaled ***from $4 million to $8 million*** – vastly out of proportion to his income.

105.    This contradiction is explained by Pinochet's well-documented involvement in the trafficking of drugs and arms.  Evidence compiled by journalist and author Hugh O'Shaughnessy suggests Pinochet's income came from a cocaine marketing operation run with the Chilean army and Chilean arms dealers, various Middle Eastern businessmen and a former corporal in the US Marine Corps, Cpl Frankell Baramdyka.

106.    Corporal Baramdyka has testified that 12 tons of cocaine were exported in 1986 and 1987 from FAMAE, the army's weapons factory, concealed in packages of Chilean-manufactured cluster bombs which were being exported to Iraq and Iran.  The cocaine was dropped off at various stops along the way, with the blessing and involvement of Pinochet.

107.    Additionally, in the wake of the revelation of Pinochet's Riggs accounts, the Chilean Congress established a commission to determine whether certain Pinochet  accounts at Riggs contain stolen Chilean government funds.

108.    From 1994 - 2002, Riggs Bank opened at least three personal accounts for Mr. Pinochet.

109.    In April 1996, Riggs Bank & Trust Co. (Bahamas) Ltd., a Bahamian subsidiary of Riggs, established Ashburton Investment Co., Ltd. ("Ashburton"), a corporation nominally

owned by the Ashburton Trust, also established by Riggs.  The trustee of the Ashburton Trust is

Riggs Bank & Trust Co. (Bahamas) Ltd.; the settlors are Mr. and Mrs. Pinochet; and the trust

beneficiaries are their five children.  Riggs Bank personnel were named as the officers and

directors of Ashburton, so that Mr. Pinochet's name never appeared on the incorporation

papers.

110.    In February 1998, Riggs Bank incorporated Althorp Investment Co., Ltd.

("Althorp"), using a similar structure to that utilized for Ashburton.  This was done to avoid a

direct, public association between Mr. Pinochet and Althorp.

111.    Riggs Bank opened several bank and investment accounts in the name of

Ashburton and Althorp and issued numerous 90-day CDs for both corporations.

112.    In October 1998, a Spanish magistrate issued two international arrest warrants

for Mr. Pinochet for human rights abuses, including, *inter alia*, murder, torture, hostage-taking,

and genocide.  On October 17, 1998, Pinochet was arrested at a London hospital.  In

conjunction with the ensuing litigation, a Spanish magistrate issued an attachment order against

all bank accounts held directly or indirectly by Mr. Pinochet, his family members, or third

parties in any country.  On November 5, 1998, Spain's highest criminal court affirmed criminal

jurisdiction over Mr. Pinochet and on December 10, 1998, ratified the attachment order against

Pinochet bank accounts.  In the United Kingdom the British Law Lords denied Mr. Pinochet's

claim of diplomatic immunity to prosecution, then set aside that determination on December 17,

1998.  On March 24, 1999, the Law Lords authorized an extradition hearing to determine

whether Mr. Pinochet should be transferred to Spain.

113.    Two days later, on March 26, 1999, Riggs Bank allowed Pinochet to prematurely

terminate the £1 million CD held in the name of Althorp at Riggs in London, and transfer the funds, totaling $1.6 million in U.S. dollars, to a new CD in the United States.  Riggs Bank did not file any Suspicious Activity Reports that would have alerted British or U.S. law enforcement to the existence of the Pinochet funds.

114.    In March 2000, the British Home Secretary determined that Pinochet was unfit to stand trial due to poor health and terminated the extradition proceedings.  Pinochet immediately departed for Chile.  Later that same month, senior Riggs Bank officials traveled to Chile and met with Pinochet.

115.    In April 2000, Chilean lawyers filed suit in Chile to remove Pinochet's immunity from prosecution due to his status as a Senator.  In May 2000, as this litigation continued, Riggs closed the final Pinochet account in London and transferred the remaining funds to a newly-opened Ashburton account at Riggs Bank in the United States.  Senior Riggs Bank officials, including General Counsel Joseph Cahill, were informed of and agreed to this transfer.  Riggs Bank failed to file any Suspicious Activity Report with any office of law enforcement.

116.    In August 2000, a Chilean appellate court upheld a lower court decision eliminating his immunity from prosecution, and on December 1, 2000, a Chilean judge indicted Pinochet for human rights violations.

117.    On December 10, 2000, the British newspaper The Observer noted that Pinochet had over $1 million in a Riggs Bank account in the United States and detailed Pinochet's long standing involvement in the international trafficking of cocaine.

118.    In response to that article, in late December or early January 2001, Riggs Bank changed the official names on the personal account controlled by Pinochet from "Augusto

Pinochet Ugarte & Lucia Hiriart de Pinochet" to "L.Hiriart &/or A. Ugarte."  By changing the official account names in this manner, Riggs Bank ensured that any manual or electronic search for the name "Pinochet" would not identify any accounts at the bank.

119.    Thus, it is clear that *in direct response to an article detailing how Riggs' was holding the proceeds of drug trafficking on behalf of a notorious violator of human rights, Riggs engaged in activity designed to ensure that the source of those funds was concealed.*

120.    On January 29, 2001, Pinochet was placed under house arrest in Chile.  On May 15, 2001, Bermuda officials announced that they had carried out an asset seizure in response to the Spanish attachment order and frozen accounts belonging to Pinochet in a Bermuda subsidiary of Standard Life Insurance.  In response, Pinochet lawyers were quoted in the news media as saying that Pinochet "has no bank accounts outside Chile."

121.    On May 21, 2001 – one week later – a lawyer at Fulbright & Jaworski provided a memorandum at the request of Steven Pfeiffer, a senior partner and head of the International Department at the law firm and, also, a long-time member of the Riggs Board of Directors. Pfeiffer additionally chairs the Riggs International Committee and serves on the Riggs Audit Committee.  This memorandum described the Spanish attachment order, some pending legal actions against Pinochet, and a pending indictment.  Attached to the memorandum were eleven news articles discussing Pinochet and describing his involvement with corruption, narcotics, arms sales, and other misconduct.  This memo observed that General Pinochet's indictment "described with excruciating detail in over 270 pages the facts and lists thousands of people who were assassinated, tortured, or disappeared during Mr. Pinochet's tenure."

122.    On this same day, Mr. Pfeiffer forwarded the memorandum and news articles to

Riggs officials Joseph Cahill and Raymond Lund.  He included his own memorandum, which began: "As requested by Ray [Lund, Riggs' Executive Vice President of International Banking] last Friday, over the week-end we reviewed certain online public news sources for articles that address the source of General Augusto Pinochet's wealth and/or ***attempts to freeze and/or seize General Pinochet's assets***." (emphasis added). The memorandum identified articles discussing "demands by 'leading political figures' in Chile to investigate the source of the Pinochet family's fortune" and efforts by the Spanish judge "to search for assets of Pinochet in the United States, Switzerland and Luxembourg."

123.    This memoranda demonstrates that senior Riggs Bank officials were fully aware of the Pinochet attachment order and seizure actions taking place in other countries, of questions about the source of Mr. Pinochet's wealth, and allegations of Pinochet's involvement with a variety of crimes.  They also suggest that Riggs was analyzing its own legal obligations.

124.    In 2002, Riggs Bank closed the Pinochet accounts and, despite the attachment proceedings, sent the funds directly to Pinochet.  Riggs Bank took no action to disclose the Pinochet accounts to any court or office of law enforcement.

125.    In addition to the above activities, Riggs Bank took questionable legal actions to help Pinochet utilize the funds in his U.S. bank accounts while in Chile.

126.    On August 18, 2000, Riggs Bank issued eight sequentially numbered cashiers checks payable to Pinochet.  Riggs Bank then paid for the private banker who sometimes handled the Pinochet relationship to travel to Chile so that he could hand deliver the checks to Pinochet.  Pinochet then cashed these checks over the next several months.

127.    On May 15, 2001, Riggs Bank again used Pinochet funds to issue ten

sequentially numbered cashiers checks for $50,000 each, payable to Maria Hiriart and Augosto P. Ugarte, which were then sent by overnight delivery to Chile.  These checks were drawn from Riggs Bank's own concentration account rather than from Pinochet's accounts.  This meant that Pinochet could cash the checks without fear that they could be traced back to one of his accounts at Riggs Bank.

128.    On October 11, 2001, Riggs Bank repeated the action a third time, issuing ten sequentially numbered cashiers checks for $50,000 each, payable to Maria Hiriart and Augosto P. Ugarte, which were then sent by overnight delivery to Chile.  These checks were drawn from Riggs Bank's own concentration account rather than from Pinochet's accounts.  This meant that Pinochet could cash the checks without fear that they could be traced back to one of his accounts at Riggs Bank.

129.    On April 8, 2002, Riggs Bank performed the same service one last time, mailing ten sequentially numbered $50,000 checks payable to Maria Hiriart and Augosto P. Ugarte to Pinochet.  These were again cashed over the next several months.

130.    The total amount of cashiers checks Riggs Bank issued to Pinochet was $1.9 million.

131.    In addition to the aforementioned activity, Riggs Bank affirmatively attempted to hide the Pinochet relationship from bank examiners.

132.    In July 2000, Riggs omitted the Pinochet accounts from a list of accounts controlled by foreign political figures requested by the OCC as part of a routine OCC anti-money laundering inspection.

133.    In 2001, an OCC bank examiner reviewed the Althorp account as a result of a

routine sampling.  When asked about Althorp's beneficial owner, Riggs Bank personnel

responded that the owner was "a publicly known figure" in Chile; his Chilean family members

"were diplomats," the account came from "Embassy [Banking]," the family members were

"landowners" with "vineyards," and the Riggs Chairman of the Board "knows" the beneficial

owner.  However, Riggs Bank never revealed the owner of the accounts was Pinochet.

134.    Additionally, when OCC examiners initially met with Riggs personnel to obtain

additional information about the Pinochet accounts, Riggs personnel initially refused

cooperation.

135.    In June 2002, the OCC directed Riggs to file a Suspicious Activity Report about

the Pinochet accounts so that law enforcement would be aware of them. Riggs complied in July

2002. The OCC considered the report so deficient, however, that it filed its own SAR soon

after.

136.    At all relevant times, Defendants were well aware of the Pinochet accounts and

either facilitated or conspired to facilitate the laundering of the funds therein.  This is well

demonstrated by the actions of those defendants

137.    Defendant Robert Roane was CC'd on a memorandum written on September 11,

2002 from Riggs Senior Vice President Paul D. Glenn to Riggs Vice President and Director of

Compliance Stanley M. Dore outlining numerous transactions made by Riggs in the Pinochet

accounts.

138.    On October 4, 2002, the Riggs Bank board of directors – including Defendants --

received an internal memorandum listing $1.9 million in suspicious withdrawals by Pinochet.

139.    Riggs board members – specifically including Joseph Allbritton and Timothy

Coughlin – actively pursed the Pinochet relationship despite his well-publicized involvement with drug trafficking, arms trafficking, and corruption.  These board members had actual knowledge of the handling of these accounts.

140.    A Riggs Bank spokesperson has acknowledged that Joseph Allbritton has met personally with Pinochet at least twice.

141.    Additionally, throughout 1996 and 1997, Joseph Allbritton drafted numerous letters to Pinochet thanking him for his business, for personal gifts Pinochet gave Joseph Allbritton and his wife, and for a reception Pinochet threw for Joseph Allbritton at a Chilean military academy.   In these drafts, Joseph Allbritton invited Pinochet and his wife to the Joseph Allbritton family horse farm.  This indicates that Joseph Allbritton had a personal relationship with Pinochet and knew details of his business dealings at Riggs.

142.    Moreover, the December 12, 2004, edition of the New York Times quotes Pinochet's financial advisor, Oscar Atiken, as saying that Pinochet's accounts **"were personally managed by Joseph Allbritton**" and described Joseph Allbritton as "**Pinochet's biggest admirer in the banking world.**"   Mr Aitken has also stated that Joseph Allbritton "promised, and delivered, rates of return that doubled General Pinochet's capital every three years."

143.    As also mentioned above, Pfeiffer read and disseminated a memorandum detailing international legal actions against Pinochet and including eleven articles describing Pinochet's involvement with corruption, narcotics, arms sales, and other misconduct, including a description of the "thousands of people who were assassinated, tortured, or disappeared during Mr. Pinochet's tenure."

144.     In 2002, during the OCC examination, the head of Riggs' International Banking

Group wrote to Riggs' then top anti-money laundering officer, indicating that "Riggs Bank Legal Affairs Division and Compliance Division have been aware of all activities relating to these accounts. At no time has the International Group acted on this account without the express consent of both the Legal Affairs and Compliance Divisions."

145.    On February 25, 2005, Defendants Joseph and Robert Allbritton personally agreed to pay $1 million to victims of Pinochet as part of a settlement in a Spanish court for criminal charges brought against current and former directors and officers of Riggs.  This is in addition to $8 million provided by Riggs as part of that same settlement

**D.    The PNC Merger**

146.    On July 16, 2004, one day after the Subcommittee Report was released, PNC announced a plan to buy Riggs National Corp. for $321 million in cash and 7.5 million shares of PNC common stock (the "Original PNC Merger").  This represented a total value of approximately $779 million.  The merger agreement – filed with the SEC on August 11, 2004, noted the following:

> [T]he Riggs board of directors believes that the merger represents a more desirable alternative for Riggs stockholders than continuing to operate as an independent public company. ***In making this determination, the Riggs board of directors gave careful consideration to its assessment of the costs and risks associated with remaining independent in light of the regulatory issues faced by Riggs and the current regulatory environment.*** . . . [t]he Riggs board of directors conducted, with the assistance of its financial and legal advisors, a ***careful review of the strategic options available to Riggs***, including the range of possible shareholder value of those alternatives and the timing and likelihood of shareholders actually receiving those values . . . . Based on its consideration of these matters, the Riggs board of directors determined that ***the merger with PNC represents the best strategic alternative reasonably available to Riggs***.

147.    The purchase price represented only a 7% premium over the value of Riggs stock

at the time the deal was announced, far less than the industry average.  Moreover, this amount was only approximately two times Riggs' book value. This is a significantly smaller premium than the industry average.

148.    By way of comparison, the only recent comparable deal in the region was the acquisition of the Community Bank of Northern Virginia by Mercantile Bankshares Corporation("Mercantile") in early 2005.  In that deal, Mercantile paid *3.3%* of the book value of the Community Bank of Northern Virginia.  Moreover, Mercantile's acquisition price represented an *18%* premium over recent closing prices of the Community Bank of Northern Virginia.  Thus, the Original PNC Merger was a significantly worse deal for Riggs shareholders than the most recent other comparable deal in the region.

149.    PNC further demonstrated the depressed nature of the acquisition price when making an investor presentation on July 16th, 2004 in connection with the proposed acquisition.

150.    At this presentation, PNC presented two charts, one entitled  "Comparable Market Extension Transactions," (attached hereto as Attachment A)  which sets out various percentages and multipliers in bank mergers comparable to the Riggs/PNC merger (including Price/Book Value and Price/Tangible Book Value) and a second entitled "Valuation Consistent With Comparable Market Extension Transactions," (attached hereto as Attachment B) which sets forth the high, median, and low measurements for these figures and then compares these figures to the Riggs/PNC merger.

151.    Moreover, the PNC/Riggs acquisition price was merely 2.03 times the book value of Riggs.  The median acquisition price is 2.73 times the book value of the bank.  Riggs' multiplier is on par with the ***lowest*** value of any of the comparable transactions.  If the Original

PNC Merger had been in line with median values for this variable, it would have been worth $32.62 per share, rather than the $24.25 in the Original PNC Merger or the $20 per share Riggs shareholders ultimately stand to receive.

152.    Not only that, but the median acquisition price in a comparable transaction is 3.36 times the tangible book value of the bank.  The proposed PNC/Riggs merger price was only 2.06 times the tangible book value of Riggs.  This was by far the *lowest* value of any of the comparable transactions.  If the Original PNC Merger had been in line with median values for this variable, Riggs shareholders would have received $39.55 per share, rather than the $24.25 in the Original PNC Merger or the $20 per share Riggs shareholders ultimately stand to receive.

153.    Riggs was thus significantly devalued for purposes of the merger when compared to recent similar transactions.

154.    The Original PNC Merger agreement contained strict "material adverse change" clauses, allowing PNC to back out of the deal if Riggs's legal, financial, or regulatory situation posed undue risk to PNC.  PNC analysts and executives indicated PNC expected to negotiate a price *below* the $779 million for the purchase of Riggs.  As detailed below, this was accurate.

155.    The Subcommittee Report, coupled with the threat of future legal and regulatory action against Riggs and an ongoing Grand Jury investigation in the District of Columbia, provided Defendants' with significant incentive to sell Riggs at a reduced value at the time the Original PNC Merger was announced.

156.    Defendants' active participation in money laundering and other related wrongful acts therefore both made the sale of Riggs necessary and reduced the price at which that sale could be made.

42

157.    The depressed price at which PNC was acquiring Riggs has been widely noted. A article published in the <u>Daily Deal</u> in February 2005 noted that "[t]he Riggs deal also offered PNC a chance to enter the capital area on the cheap, as it had agreed to pay 2 times book value for Riggs. In the only recent deal in the region, Mercantile agreed to pay $212 million for Community Bank of Northern Virginia, or 3.3 times book value — a valuation more than 50% higher than Riggs."

158.    Indeed, the July 17th, 2004 Washington Times noted that "[s]ome analysts believe regulators investigating Riggs forced its sale."

159.    Subsequent developments to the Original PNC Merger further tainted the merger negotiations.  As detailed above, Riggs Bank pled guilty to a criminal offense on January 27, 2005, as a result of their knowing and willful violations of the Bank Secrecy Act.  This further tainted the merger – as RBC Capital Markets analyst Gerard Cassidy noted, "PNC [was] buying damaged goods and they understood that going into the transaction."

160.    In the wake of these developments, the Original PNC Merger collapsed on February 7, 2005, as PNC attempted to renegotiate the acquisition price downwards to reflect developments subsequent to the Original PNC Merger.  PNC explained the collapse as follows:

> Since July, there have been numerous unexpected adverse developments at Riggs, including a criminal plea of guilty by Riggs National Bank.  In addition to sizeable fines that have been imposed on Riggs, it has faced an exorbitant run rate of legal and compliance expenses related to a litany of legal and regulatory matters that Riggs continues to face, along with other losses.  The business and results of operations at Riggs have also suffered significant deterioration as illustrated by the recent guidance relating to its 2004 loss.

> Despite these matters, PNC has evidenced a good faith desire to negotiate a fair restructuring of the terms of our pending transaction.  In recent days, we have approached the Riggs Board and proposed an

appropriate price adjustment to reflect the deteriorations that have occurred at Riggs since July, along with proper protection against remaining contingent liabilities.

We believe that the offer that we have put forward is fair. We also do not understand how Riggs can possibly claim that we are without basis for asserting that a Material Adverse Effect under our merger agreement has occurred, based on the facts to which Riggs itself has fully conceded with respect to the deterioration that has occurred at Riggs since the signing of the July merger agreement

161.    In connection with the collapse, Riggs filed suit against PNC on February 7, 2005 in the Superior Court of the District of Columbia seeking damages in connection with the breakdown of the merger. Riggs' complaint noted the effect that Defendants' RICO activities had on the decision to sell the bank by observing "Riggs determined early in 2004 to . . . consider strategic alternatives for the future, including a possible sale. A principal reason for considering a sale was a view that *a larger, stronger purchaser would be in a better position to deal with Riggs's BSA compliance and other regulatory issues.*"  (emphasis added). <u>See</u> Attachment C at ¶ 22.

162.    The Complaint – again, filed by Riggs – complained that "PNC [had planned to] propose such a large reduction in the purchase price that it was highly unlikely that Riggs could accept the reduced offer but that if Riggs did accept the reduced price, *PNC would virtually steal Riggs.*"  As noted below, Riggs ultimately agreed to the purchase price PNC had proposed, which Riggs characterized as a theft of Riggs. <u>See</u> Attachment C at ¶ 72.

163.    Later that same day, a representative of PNC restarted merger discussions with Riggs. PNC's S-4 form, filed on February 25, 2005 with the SEC, described the renewed negotiations as follows:

On the night of February 7, a representative of PNC contacted Lehman Brothers

regarding the possibility of restarting negotiations with Riggs. At that time, PNC indicated that it would be willing to proceed with the transaction at a reduced purchase price of $20.00 per share and without the conditions or contingencies contained in PNC's previous proposal. On February 8, Riggs' counsel provided a draft amended and restated merger agreement and related documents to PNC's counsel.

During the morning of February 10, the Riggs board of directors met, with the directors of Riggs Bank present, to consider PNC's latest proposal. Lehman Brothers and Sullivan & Cromwell each made presentations. The subjects covered in these presentations, and in the deliberations and questions by the directors, included: the financial terms of the proposal; the changes to the merger agreement (including a bring-down in the material adverse change clause to February 10); and the ***likelihood that Riggs could enter into an alternative transaction if it rejected the PNC proposal and the time it would take to close an alternative transaction compared to the time it would take to close the PNC transaction, particularly in light of Riggs' regulatory issues*** . . . After deliberation and questions by the board, the board preliminarily decided to accept the PNC proposal. (emphasis added).

164.    As such, the "regulatory issues" created by Defendants RICO acts again provided the incentive to sell Riggs and tainted the merger negotiations.  On February 10th, Riggs and PNC announced a new merger agreement had been reached, valued at approximately $652 million, or $20 per share of common stock.  This was a $127 million decline in the acquisition price and, correspondingly, in the value each holder of Riggs common stock could expect to receive in connection with the transaction.

165.    The negotiations of this new agreement were no doubt tainted by the revelations of Defendant's activities, detailed throughout this Complaint.  Indeed, the merger itself was necessitated by, and proximately caused by Defendants' illegal money laundering, wire fraud, and mail fraud activities detailed herein, which directly and proximately caused the consideration to be received by the class in connection with the PNC acquisition to be depressed.

45

166.    As such, the PNC merger, in its ultimate form, represents a price $127 million

**below** a price which was **already** significantly below average in virtually every major valuation

measurement when compared to like transactions.  The timing of the announcement of the

Original PNC Merger – **one day** after the Subcommittee Report detailing Defendants'

transgressions was publicly released – coupled with the circumstances surrounding the

downwards renegotiation demonstrate this reduced value is attributable to the events detailed

herein.

167.    The Merger, in its final form, is **at least** $12 per share less than that in

comparable transactions.

## FIRST CLAIM FOR RELIEF

### (18 U.S.C. § 1964(c))

168.    Plaintiff repeats and realleges all previous allegations as if set forth herein.

169.    Plaintiff is a "person" within the meaning of 18 U.S.C. §1961(3) and 18 U.S.C.

§1964(c) and brings this action pursuant to 18 U.S.C. §1964(c).

170.    Each of the Defendants named in this Count, hereinafter sometimes collectively

referred to as the "RICO Defendants," is a "person" within the meaning of 18 U.S.C. §1961(3).

171.    Riggs Bank is an "enterprise" within the meaning of 18 U.S.C. §1961(4). During

the relevant times as described above in this Complaint, this enterprise engaged in, or its

activities affected, interstate and/or foreign commerce.

172.    During the relevant times, Defendants were employed by or associated with the

said enterprise.

173.    During the relevant times, Defendants conducted and participated, directly and

indirectly, in the racketeering activity complained of herein.

174.    The said racketeering activity consisted of two or more incidents of racketeering conduct engaged in by the RICO defendants.

175.    The racketeering activity, as described in 18 U.S.C. §1961(1), includes but is not limited to:

> a.    Repeated acts of money laundering within the meaning of 18 U.S.C. § 1961(1) and 18 U.S.C. § 1956;
>
> b.    Repeated acts of mail fraud within the meaning of 18 U.S.C. § 1961(1) and 18 U.S.C. § 1341;
>
> c.    Repeated acts of wire fraud within the meaning of 18 U.S.C. § 1343.

176.    These acts of racketeering were interrelated by distinguishing characteristics in that they had the same purpose, results, participants, victims, and methods of commission.

177.    This racketeering activity was a regular way of conducting Defendants' business and was Defendants' way of conducting and participating in the Enterprise.

178.    The racketeering activity was the proximate cause of a decline in value of Riggs National and therefore resulted in injury to Plaintiff's property.

179.    Plaintiff was therefore directly injured by the Defendants in their business and property in an undetermined amount, by reason of Defendants' violations of 18 U.S.C. §1962(c) as described herein, and within the meaning of 18 U.S.C. §1964(c).

## SECOND CLAIM FOR RELIEF

### (18 U.S.C. §1962(a))

180.    Plaintiff repeats and realleges all previous allegations as if set forth herein.

181.    For the purposes of this Claim, the enterprise described above comes within the meaning of 18 U.S.C. §1961(4) and 18 U.S.C. §1962(a).

182.    During the relevant times, Defendants received income derived, directly or indirectly, from the above described patterns of racketeering activity, in which they participated as principals within the meaning of 18 U.S.C. §1962(9).  These RICO defendants also used or invested, directly or indirectly, a part of that income or the proceeds of that income to acquire an interest in, or establish, or operate the said enterprise described above, when the said enterprise was engaged in interstate or foreign commerce, all within the meaning of 18 U.S.C. §1962(a).

183.    Plaintiff was directly injured by Defendants in their business and property in an undetermined amount, by reason of Defendants' violations of 18 U.S.C.§1962(a), all within the meaning of 18 U.S.C. §1962(c)).

## THIRD CLAIM FOR RELIEF

### (18 U.S.C. §1962(d))

184.    Plaintiff repeats and realleges all previous allegations as if set forth herein.

185.    Defendants knowingly agreed and conspired with each other to violate 18 U.S.C. §1964(c) and 18 U.S.C. §1964(a), and took the acts during the Period described in this Complaint in furtherance of that conspiracy, all in violation of 18 U.S.C. §1962(d).

186.    The evidence of this conspiracy can be found in the interactions between Defendants detailed throughout this complaint, including but not limited to the many meetings and committees Defendants had with one another for the express purpose of managing the accounts at issue.  This includes the repeated acts of both active facilitation of money

laundering and complicity in the commission of those acts.

187.    As detained herein, Defendants agreed to conduct the business of Riggs by laundering money for numerous individuals so as to enable those individuals to hide the proceeds of criminal activity.  In doing so, Defendants also committed numerous acts of wire and mail fraud, including but not limited to the transfers detailed above.

188.    As a result of Defendants' violation of 18 U.S.C. §1962(d), Plaintiff and Riggs shareholders have been injured in their business and property.

## JURY DEMAND

Plaintiff requests a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants and each of them, jointly, severally, or in the alternative, as follows:

Determining that this action is a proper class action and appointing Plaintiff as Lead Plaintiff and its counsel as Lead Counsel for the Class and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

An award in favor of the Class against all Defendants, for the amount of damages and losses sustained by Riggs as a result of Defendants' RICO violation and other wrongdoing alleged herein,

Awarding Plaintiff threefold damages, the cost of this action, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1961(1) *et seq.*; and

Awarding Plaintiff such other and further relief as this Court may deem proper and just. Dated: March 11, 2005.

FINKELSTEIN, THOMPSON & LOUGHRAN


By:_____/s/ Donald Enright_____

        Donald J. Enright (No. MD013551)
        Burton H. Finkelstein (No. 105213)
        Foundry Building
        1050 30th Street, N.W.
        Washington, D.C. 20007
        Tel:   (202) 337-8000
        Fax:   (202) 337-8090

        Herbert E. Milstein (No. 26203)
        Steven J. Toll (No. 225623)
        Adam T. Savett (No. 484254)
        COHEN MILSTEIN HAUSFELD
            & TOLL, P.L.L.C
        1100 New York Avenue, N.W.
        West Tower, Suite 500
        Washington, D.C.  20005
        Tel: (202) 408-4600
        Fax: (202) 408-4699

        *Attorneys for Plaintiff*

Of Counsel:

Laurence D. Paskowitz
PASKOWITZ & ASSOCIATES
60 East 42nd Street
46th Floor
New York, NY 10165
Tel:   (212) 685-0969
Fax:   (212) 685-2306

Arthur J. Salzberg
ARTHUR J. SALZBERG & ASSOCIATES, P.C.
Air Rights Center, North Tower
Suite 601
7315 Wisconsin Avenue
Bethesda, MD 20814
Tel:   (301) 913-0222

Fax:    (301) 913-0246