## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FREEPORT PARTNERS, L.L.C., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 04-2030 (GK) |
| JOSEPH L. ALLBRITTON et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

### MEMORANDUM OPINION

Plaintiff, Freeport Partners, L.L.C. ("Freeport Partners"), brings this action on behalf of itself and a putative class of shareholders of Riggs National Corporation ("Riggs"), the parent company of Riggs Bank, N.A. ("Riggs Bank" or "the Bank"). Plaintiff alleges that Defendants,[1] who are former directors or employees of Riggs, engaged in acts of money laundering, wire fraud, and mail fraud in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq.. Am. Compl. ¶ 1. According to Plaintiff, these unlawful activities caused a decline in the value of Riggs common stock and led to its July 2004 merger with PNC Financial Services Group ("PNC") at what Plaintiff claims was a depressed price. Id. ¶¶ 1-10.

This matter is currently before the Court on two Motions: Plaintiff's Motion for Final Approval of Class Action Settlement

---

[1] Defendants are Joseph Allbritton, Robert Allbritton, J. Carter Beese, Timothy Coughlin, Lawrence Hebert, Simon Kareri, and Robert Roane.

and Certification of the Settlement Class [Dkt. No. 49] and
Plaintiff's Motion for Attorneys' Fees [Dkt. No. 43].  The Court
has carefully considered the Motions, the related affidavits,
declarations, and exhibits, the parties' representations at a
Fairness Hearing held on March 1, 2006, and the entire record
herein.  For the reasons stated below, Plaintiff's Motion for Final
Approval of Class Action Settlement and Certification of the
Settlement Class is hereby **granted**, and Plaintiff's Motion for
Attorneys' Fees is hereby **granted in part and denied in part**.

I.   **BACKGROUND**

    **A.   Facts**

    Freeport Partners is an "investment club" founded by a "small
number of longtime friends and business associates."  Pl.'s Resp.
to the Court's Mem. Order [Dkt. No. 33] (hereinafter "Pl.'s
Resp."), Ex. A, Drulias Decl. ¶ 2.  Organized as a Nevada limited
liability company, Freeport bought five shares of Riggs stock some
time before July 16, 2004, the day Riggs entered into a merger
agreement with PNC Financial Services Group, Inc. ("PNC"), and an
additional 95 shares on February 10, 2005, the day PNC announced it
would acquire Riggs at a lower price than had previously been
negotiated.  Pl.'s Resp. at 4.  Freeport held those shares at least
through May 13, 2005, which was the effective date of the Riggs-PNC
merger.  Id.

Defendants are all former directors or employees of Riggs, the corporate parent of Riggs Bank, which prior to its merger with PNC was the largest and one of the most prominent financial institutions headquartered in Washington, DC.  Plaintiffs claim that between 1997 and 2004, Riggs Bank employees, and specifically the members of its International Banking Group, engaged in illegal money laundering, wire fraud, and mail fraud on behalf of several large clients.[2]  Am. Compl. ¶¶ 1-10, 37.  Defendants, Plaintiff alleges, knew such activities were occurring and actively encouraged them.  Id. ¶ 1.

Beginning in 2002, when the Bank was cited by the Office of the Comptroller of the Currency ("OCC") for weak anti-money laundering controls, Riggs became the subject of media reports regarding suspicious transactions in its International Banking Group.  Id.  ¶ 38.  Based on those reports, the Senate Committee on Government Affairs began investigating Riggs in 2003.  Id. ¶¶ 39-40.

In July 2003, Riggs entered into a Consent Order with the OCC that required the Bank to take various actions to ensure better compliance with the Bank Secrecy Act and other money laundering statutes.  Id. § 41.  That Order also subjected Riggs to increased regulatory monitoring.  In May 2004, the OCC cited Riggs for

---

[2]  Riggs Bank's more notable clients included General Augusto Pinochet of Chile, President Obiang Nguema Mbasogo of Equatorial Guinea, and members of the Saudi royal family.

failure to abide by the Consent Order and imposed a civil penalty of $25 million.  <u>Id.</u> § 45; <u>see</u> <u>also</u> Terence O'Hara, <u>Riggs Lost $34.4 Million, Hurt by Fines, Core Operations</u>, Wash. Post, Aug. 10, 2004, at E01.

Following its year-long investigation, the Senate Committee on Government Affairs issued a damaging report on July 15, 2004.  <u>Id.</u> § 46.  The report accused Riggs Bank employees and directors, including several Defendants, of engaging in money laundering and fraud on behalf of certain clients, including General Pinochet and President Mbasogo.  <u>See</u> Terence O'Hara and Kathleen Day, <u>Riggs Bank Hid Assets Of Pinochet, Report Says</u>, Wash. Post, July 15, 2004, at A01.

Just after the Senate Committee released its report, in August 2004, the U.S. Attorney's Office for the District of Columbia and the U.S. Department of Justice opened criminal investigations into Riggs Bank's operations. <u>See</u> Kathleen Day, <u>Criminal Probe of Riggs Bank Underway</u>, Wash. Post, Aug. 21, 2004, at E01.  On January 27, 2005, Riggs entered a guilty plea to one charge of failure to report potential money laundering and agreed to pay a $16 million fine.  Am. Compl. ¶ 7; <u>see</u> <u>also</u> Terence O'Hara, <u>Riggs Bank Agrees to Guilty Plea And Fine</u>, Wash. Post, Jan. 28. 2005, at A1.

The citation by the OCC and resulting fine, the Senate Committee's investigation and report, and the criminal investigations and guilty plea generated extensive – and negative

– media attention for Riggs throughout 2004 and early 2005. According to Plaintiffs, these events precipitated a decline in the value of Riggs stock during that same period, a decline that they contend Defendants proximately caused by encouraging and assisting unlawful financial transactions at Riggs Bank.  Am. Compl. ¶ 1.

PNC and Riggs began merger talks in the spring of 2004.  On July 16, 2004, PNC agreed to purchase Riggs for $779 million, or approximately $24.25 per share.  Id. ¶ 5.  On February 7, 2005, however, shortly after Riggs entered its guilty plea, PNC backed out of the merger, citing "unexpected adverse developments at Riggs" and "a litany of legal and regulatory matters that Riggs continues to face."  Id. ¶ 8.  Three days later, on February 10, 2005, PNC and Riggs announced that they had reached a new merger agreement, this time for $652 million or $20 per share.  Id. ¶ 9. Plaintiff alleges that this merger, which was consummated on May 13, 2005, occurred at a deep discount to PNC and deprived Riggs shareholders of the reasonable value of their shares.  Id. But for Defendants' money laundering, wire fraud, and mail fraud, Plaintiffs maintain, PNC would have paid substantially more to purchase Riggs stock than it ultimately did.  Id. ¶ 1.

Plaintiff seeks the following relief: (1) a declaratory judgment that Defendants committed RICO violations that proximately caused shareholder losses through the merger with PNC at a depressed price; (2) certification of a class of Plaintiff

shareholders who suffered financial losses; (3) money damages for those losses; and (4) costs and attorneys' fees.

## B.   Procedural History

Plaintiff initiated this action on November 18, 2004 and filed an Amended Complaint against Defendants on March 11, 2005. Defendants responded with a Joint Motion to Dismiss [Dkt. No. 20] on April 11, 2005.  They argue, first, that Plaintiff's losses were not proximately caused by Defendants' activities and, therefore, Plaintiff has no standing to bring a RICO suit against them.  Second, they claim that the Private Securities Litigation Reform Act of 1995 ("PLSRA") precludes a suit under RICO where, as here, the grounds consist of conduct that would be actionable as securities fraud.  Third, and finally, they contend that even if a RICO case could lie here, Plaintiffs did not plead sufficient facts to permit the required inference that Defendants personally committed racketeering activity.  Defs.' Joint Mot. to Dismiss [Dkt. #20] at 1-4.

The parties began settlement negotiations in early 2005 and on March 22, 2005 Plaintiff made its initial demand of $19 million.[3] See Pl.'s Resp. at 13.  Defendants rejected that offer, but the

---

[3]  In its merger with Riggs, PNC agreed to indemnify all Riggs directors and employees for any litigation arising out of actions they took in their official capacities.  See Pl.'s Resp. at 12. Accordingly, PNC conducted the settlement negotiations described herein and is the sole contributor to the settlement fund that is currently before the Court.

talks continued.  See Pl.'s Resp. at 14.  Plaintiff brought renewed intensity to the bargaining table in the spring of 2005 after it became clear that the pending settlement of a Riggs shareholders' derivative action in Delaware state court might jeopardize this case.  In June 2005, Defendant made its "final and best offer of $5.25 million," which Plaintiff accepted on behalf of a putative class of shareholders.  Id. at 14.

On July 21, 2005, the parties executed a Stipulation and Agreement of Settlement (hereinafter the "Agreement") providing, inter alia that: (1) Defendants would establish a gross settlement fund of $5.25 million for distribution to the class plus $100,000 for administrative expenses;[4] (2) all administrative costs over and above the $100,000 and attorneys' fees would be deducted from the fund prior to any distribution to the class; (3) distribution would be made on a pro rata basis to all record holders of common stock in Riggs National Corporation as of May 13, 2005, excluding Defendants and their successors in interest; and (4) the Garden City Group of Melville, NY would serve as Settlement Administrator. See  Pl.'s  Mot.  to  Certify  Class  and  Preliminarily  Approve Settlement and Approve Class Notice [Dkt. No. 29], Ex. A.[5]

---

[4]     As  of  March  1,  2006,  the  settlement  fund  totaled $5,332,011.97, adjusted for the interest it had earned in escrow.

[5]     In a filing dated March 9, 2006, the parties amended the Agreement, responding to the Court's concern that it did not make adequate  provision  for  any  money  that  might  remain  in  the
(continued...)

Specifically, the Agreement defined the class as consisting of:

> All persons who held Riggs common stock at any time
> during the period from July 15, 2004 through May 13,
> 2005, inclusive, and their respective representatives,
> trustees, executors, administrators, heirs, transferees,
> successors, and assigns, exclusive of the Defendants,
> Former Defendants, Simon Kareri, their immediate family
> members, and their affiliates, predecessors, successors,
> representatives, trustees, executors, administrators,
> heirs, assigns or transferees, immediate or remote, and
> any person or entity acting for or on behalf of, or
> claiming under any of them, and each of them.   Also
> excluded from the Class are any putative class members
> who exclude themselves by serving a timely request for
> exclusion in accordance with the requirements set forth
> in the Notice.

Agreement ¶ 1(c).

Because Federal Rule of Civil Procedure 23(e) requires Court approval for the settlement of any class action, Plaintiff filed an Unopposed Motion for Preliminary Certification of the Class for Settlement Purposes and Preliminary Approval of the Settlement and Class Notice on October 7, 2005; see also Fed. R. Civ. P. 23(e). The Court then ordered Plaintiff to answer a series of specific questions regarding the settlement so that it would be in a better position to make the requisite findings under Rule 23(e).  See Mem. Order Staying Plaintiff's Preliminary Mot. for Class Certification

---

[5](...continued)
settlement fund after distribution to the class.  According to the amended Agreement, any such funds that remain one year after the Settlement Administrator initiates distribution to the class will be donated to the Legal Aid Society of the District of Columbia. See Pl.'s Unopposed Mot. to Modify the Proposed Order and Final Judgment [Dkt. No. 52] ¶ 17.

[Dkt. No. 32].   Plaintiff filed its Response, as ordered, on November 15, 2005.   See Dkt. No. 33.

On November 30, 2005, the Court granted Plaintiff's Motion, preliminarily certifying the class for settlement purposes and preliminarily approving the settlement.   See Dkt. No. 35.   The Court approved the proposed Notice to the Class ("Notice") and ordered the Settlement Administrator to include copies of Plaintiff's Motion for Attorneys' Fees and Costs ("Attorneys' Fees Motion") [Dkt. No. 43] in its mailing of the Notice.

According to its February 14, 2006 affidavit, the Settlement Administrator sent a total of 16,110 Notice packets to the class between December 30, 2005 and February 13, 2006.   See Dkt. No. 48 ("Fraga Aff.").   The Settlement Administrator also posted the Notice and the Attorneys' Fees Motion on its website, and established a toll-free phone number for inquiries regarding the settlement.   Id.   As of the date of its affidavit, the Administrator had received fifty seven phone calls about the settlement.

Pursuant to the Notice, the deadline for opting out of the class was February 13, 2006 and the deadline for filing objections was February 19, 2006.   Only one member of the class, who owned sixteen shares, opted out.   See Notice of Request for Exclusion [Dkt. No. 51].   Furthermore, only one objection was filed, from a shareholder who objected not to the settlement itself but to the

attorneys' fees being paid before funds are distributed to the class.  See Objection to Plaintiff's Motion for Attorney Fees by Party of the Class [Dkt. No. 46].

On February 21, 2006, Plaintiff filed an Application for Final Approval of Class Action Settlement and Certification of the Settlement Class [Dkt. No. 49] (hereinafter "Pl.'s Mot. for Final Approval and Certification").  The Court held a Fairness Hearing on March 1, 2006 to consider that Motion, as well as the Attorneys' Fees Motion.  Only counsel for Plaintiff and for Defendants participated in that Hearing; no member of the class appeared either in support of, or in opposition to, the settlement.

## II.  THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23 AND IS THEREFORE CERTIFIED FOR SETTLEMENT PURPOSES

### A.  Standard of Review

Federal Rule of Civil Procedure 23(a) requires the plaintiff to satisfy the following four requirements before a class can be certified: (1) the class must be so numerous that joinder of all members is impracticable ("numerosity"); (2) there must be questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class ("typicality"); and (4) the representative parties, and their counsel, must fairly and adequately protect the interests of the class ("adequacy").  See

-10-

Fed. R. Civ. P. 23(a). In addition, the plaintiff must satisfy one of the three requirements of Rule 23(b).

The plaintiff bears the burden of proof on each element of Rule 23. See McCarthy v. Kleindienst, 741 F.2d 1406, 1414, n.9 (D.C. Cir. 1984). "A district court exercises broad discretion in deciding whether to permit a case to proceed as a class action." Hartman v. Duffey, 19 F.3d 1459, 1471 (D.C. Cir. 1994); see also Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 (1981).

A class may be certified for settlement purposes only, Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 618 (1997), and such "settlement-only" classes have become an increasingly prominent feature of federal class action practice. See T. Willging, L. Hooper, & R. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 61-62 (1996). Our Court of Appeals has instructed courts to approach certification of a settlement-only class with the same degree of scrutiny they would use to evaluate a traditional motion for class certification. See Thomas v. Albright, 139 F.3d 227, 234 (D.C. Cir. 1998).

**B.   Analysis**

**1.   Rule 23(a)**

**i.   Numerosity**

Rule 23(a)(1) allows a court to certify a class if it determines that "joinder of all members is impracticable." See

Fed. R. Civ. P. 23(a)(1).  The Rule does not encompass a mechanical formula for determining numerosity.  See General Tel. Co. of the Northwest, Inc. v. EEOC, 446 U.S. 318, 330 (1980).  Instead, it gives courts discretion to decide whether the number of plaintiffs is so large that using the class action mechanism would serve the interests of judicial economy and efficiency.  See Council of and for the Blind of Delaware County Valley, Inc. v. Regan, 709 F.2d 1521, 1544 n.48 (D.C. Cir. 1983) (Robinson, J., concurring in part and dissenting in part).

The Settlement Administrator in this case mailed the Notice to 16,110 individuals and entities listed as record or beneficial holders of Riggs common stock during the class period.  See Fraga Aff. ¶ 10.  Although not every Notice recipient will ultimately qualify as an authorized claimant, the majority likely will and thus the number of Notice recipients is a good, if slightly inflated, estimate of the size of the class.  Given that there are well over 15,000 members of the class, the Court has no trouble concluding that joinder would be highly impracticable in this case.  Consequently, the numerosity requirement of Rule 23(a)(1) is satisfied.

### ii.  Commonality and typicality[6]

---

[6]   As the Supreme Court has noted, the commonality and typicality analyses, though distinct, "tend to merge" because "both serve as guideposts for determining whether the named plaintiff[s'] claim and the class claims are so interrelated that the interests
(continued...)

The commonality requirement of Rule 23(a)(2) is satisfied where "there are questions of law and fact common to the class." Fed. R. Civ. P. 23(a)(2).  Commonality exists "where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12, 26 (D.D.C. 2001) ("Lorazepam I") (quoting Lightbourn v. County of El Paso, 118 F.3d 421, 426 (5th Cir.1997)).

Rule 23(a)(3) requires a court to determine that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This typicality requirement is "'intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented.'"  Kifafi v. Hilton Hotels Ret. Plan, 189 F.R.D. 174, 177 (D.D.C. 1999) (quoting Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994)).  Typicality is satisfied "if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's

---

[6](...continued)
of the class members will be . . . protected in their absence. Falcon, 457 U.S. at 157 n.13.  The Court will therefore address these factors together.

liability."   Pigford v. Glickman, 182 F.R.D. 341, 349 (D.D.C. 1998).

With these principles in mind, the Court finds that there are questions of law and fact common to the class and thus that Rule 23(a)(2) is satisfied.   Plaintiffs identify three questions "the resolution of which will affect all or a significant number of the putative class members."  Lorazepam I, 202 F.R.D. at 26.  They are:

> Whether [PNC's] acquisition price of Riggs was depressed as a result of Defendants' actions and, if so, to what extent;
>
> Whether . . . Defendants can be held liable under RICO for lowering the value of the [c]lass's property in connection with the Merger based on their legal and regulatory violations; and
>
> Whether the Class was damaged by Defendants' acts and, if so,  the extent of such damages and/or the nature of the relief, statutory damages, or exemplary damages which the [c]lass is entitled to plead and prove.

Pl.'s Mot. for Final Approval and Certification at 18.  Because answering these questions will determine Defendant's liability vel non to Plaintiff and to the class as a whole, they are sufficient to establish commonality.

Pursuant to Rule 23(a)(3), the Court also finds that the claims of the representative parties are typical of those of the entire class.   Plaintiff was a Riggs shareholder, albeit a relatively small one, throughout the class period.  Id.  If, as Plaintiff alleges, all Riggs shareholders suffered a loss as a result of the PNC merger, Plaintiff must have shared

proportionately in those losses.  Furthermore, Plaintiff's claims arise out of the "same course of events" that cause Defendants' alleged liability to the class as a whole.  See Pigford, 182 F.R.D. at 349.  Accordingly, Plaintiff presents claims that can only be described as typical of the class.

### iii. Adequacy

Rule 23(a)(4) requires a court to find that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy analysis "serves to uncover conflicts of interest between the named parties and the class they seek to represent."  See Amchem, 521 U.S. at 626.  To satisfy Rule 23(a)(4), the "named representative[s] must not have antagonistic or conflicting interests with the unnamed members of the class."  Twelve John Does v. District of Columbia, 117 F.3d 571, 575 (D.C. Cir. 1998).

The adequacy requirement extends to class counsel as well. See Amchem, 521 at 626 n.20; McCarthy, 741 F.2d at 1411, n.3.  As our Court of Appeals has explained, trial courts have a duty to investigate the adequacy of class counsel in order "to protect class members where such members did not choose their counsel and where retention of other lawyers is unlikely."  Pigford v. Veneman, 416 F.3d 12, 25 (D.C. Cir. 2005) (Rogers, J., concurring in part and dissenting in part).

The loss Freeport Partners claims to have suffered is identical to that allegedly incurred by other members of the class, and its recovery under this settlement will be proportional to the number of Riggs shares it owned.  Plaintiff has not received any compensation for serving as class representative and the settlement gives it no preferential treatment or special benefits.  Pl.'s Mot. for Final Approval and Certification at 20.  As a result, its interests in this litigation, and this settlement, align perfectly with those of the class as a whole and it is a fair and adequate representative of it.

The Court must also consider whether Plaintiffs' attorneys are competent and conflict-free.  <u>See</u> <u>Pigford</u>, 292 F.3d at 926. Plaintiff's lead counsel – the law firms of Cohen, Milstein, Hausfeld & Toll and Finkelstein, Thompson & Loughran –  are experienced litigators with significant experience in federal class actions.  While the Court has less familiarity with the other law firms representing Plaintiff, there appears to be no grounds for questioning their competence.  <u>See</u> Pl.'s Resp. at 19-20.

The Court does, however, share a general concern that is commonly expressed in the case law and scholarly literature: that too often in settlement-only class actions, the lawyers "define[] the group membership, manage[] the litigation, make[] unilateral strategic decisions, oversee[] the accrual of fees and costs, and shape[] the outcome of a mysterious process class members neither

launched nor agreed to resolve." Alexandra Lahav, <u>Fundamental</u>
<u>Principles for Class Action Governance</u>, 37 IND. L. REV. 65, 66
(2003). In such situations, there is a real danger that "lawyers
. . . may, in derogation of their professional and fiduciary
obligations, place their pecuniary self-interest ahead of that of
the class." <u>Reynolds v. Beneficial Nat. Bank</u>, 288 F.3d 277, 279
(7th Cir. 2002); <u>see</u> <u>also</u> John C. Coffee, Jr., <u>The Regulation of</u>
<u>Entrepreneurial Litigation: Balancing Fairness and Efficiency in</u>
<u>the Large Class Action</u>, 54 U. Chi. L. Rev. 877, 882-83 (Summer
1987) (noting that in many class actions "it is more accurate to
describe the plaintiff's attorney as an independent entrepreneur
than as an agent of the client").

Despite the Court's general concern about the dynamics of
settlement-only class actions, and their potential effects on
counsel, there is no specific reason to believe that Plaintiffs'
attorneys cannot fairly and adequately represent the class.[7] They
appear to have maintained regular communication with the leadership
of Freeport Partners and to have sought their client's advice at
each stage of this litigation. <u>See</u> Pl.'s Mot. for Final Approval
and Certification at 20-21. Furthermore, they appear to have
vigorously represented the interests of Plaintiff and the class
throughout this litigation. Accordingly, the Court finds that the

---

[7] It was, however, rather unsettling to learn at the Fairness
Hearing that lead counsel, Herbert Milstein, had never even met any
of the members of his client, Freeport Partners, L.L.C.

adequacy requirement of Rule 23(a)(4) is satisfied as to both the class representative and class counsel.

### 2.   Rule 23(b)

Plaintiffs seek to certify a class under Rule 23(b)(3), a provision that governs certification in matters where the sole or primary relief sought is money damages.   The Rule requires Plaintiffs to establish that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

The "predominance" test of Rule 23(b)(3) is generally satisfied "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position."  See In re Vitamins Antitrust Litig., 209 F.R.D. 251, 262 (D.D.C. 2002) (citation omitted).  That is clearly the case here.  The effect Defendants' alleged wrongdoing had on the value of Riggs stock and the merger price is the critical issue in this case.  What injuries the class sustained and what damages it should receive turn entirely on the resolution of that issue.  Because there are no questions affecting individual members of the

class only, their fortunes in this case will necessarily rise or fall together.[8]

This is also a case where the class action provides the superior method of adjudication, for many of the reasons noted above.  The size of the class, the uniformity of the issues respecting Defendants' liability, and the typicality of Plaintiff's claims all weigh strongly in favor of  maintaining this as a class action, rather than as large number of individual actions. Accordingly, the Court will certify the class pursuant to Rule 23(b)(3).

## III. THE SETTLEMENT AGREEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND MERITS FINAL APPROVAL

### A.   Standard of Review

A court may approve a class action settlement if it is "fair, adequate, reasonable, and is not the product of collusion between the parties." Thomas, 139 F.3d at 231 (internal citation omitted); Fed. R. Civ. P. 23(e)(1)(C).  Public policy in this Circuit favors settlement of class actions, Mayfield v. Barr, 985 F.2d 1090, 1092 (D.C. Cir. 1993), and "a presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms' length negotiations between experienced, capable counsel after meaningful discovery."  In re Vitamins Antitrust Litig., 2001 WL

---

[8]  It is worth noting that the possibility that damage awards may vary between members of the class does not mean that predominance cannot be satisfied.  See McCarthy, 741 F.2d at 1415.

856290 at *2 (D.D.C. 2001) (quoting MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.42).  Notwithstanding this presumption, the decision whether to approve a particular settlement lies firmly within the trial court's discretion.  See In re Lorazepam & Clorazepate Antitrust Litig., 2003 U.S. Dist. LEXIS 12344 at *4-5 (D.D.C. 2003) ("Lorazepam II").

Assessing the adequacy of a proposed settlement requires consideration of several factors:

> [the] complexity and nature of the litigation; potential costs of litigation; the stage of the proceedings when settlement has been offered and degree of completed discovery; likelihood of establishing requisite elements of liability and damages; class reaction to settlement; risks attendant to trial; and ability of defendant to absorb a larger recovery.

In re Baan Sec. Litig. 284 F. Supp. 2d 62, 64 (D.D.C. 2003) (quoting In re Nat'l Student Mktg. Litig., 68 F.R.D. 151, 155 (D.C. 1974).

When a case settles well before trial, as in this case, a court lacks the benefit of an adversarial process to sharpen the issues and must itself determine whether the settlement is in the best interests of the class.  In this context, courts must use special care in scrutinizing the fairness, adequacy, and reasonableness of a proposed settlement.  Some courts have gone so far as to describe the trial judge's role as a "fiduciary of the class."  Reynolds, 288 F.3d at 280; see also Duhaime v. John Hancock Mut. Life Ins. Co., 183 F.3d 1, 7 (1st Cir. 1999); Rand v.

Monsanto Co., 926 F.2d 596, 599 (7th Cir. 1991); Manual for Complex Litigation, Fourth, § 21.61 (counseling judges to "adopt the role of a skeptical client" when considering settlement-only class actions").[9]

**B.   Analysis**

Plaintiff argues that the proposed settlement "provides an excellent recovery for the class" and easily meets the standard embodied in Rule 23(e).  See Pl.'s Mot. for Final Approval and Certification at 2.  The Court will use the factors set forth in National Student Marketing to guide its inquiry on this issue.  See In re Nat'l Student Mktg. Litig., 68 F.R.D. at 155.

### 1.   The Complexity and Potential Costs of the Litigation and the Risks Attendant to Trial

There is no question that this would have been an extremely complex and expensive matter to litigate.  The difficult task of establishing Defendants' RICO liability would have required protracted and complicated discovery.  The services of at least one financial expert or forensic accountant would have been necessary

---

[9]  Scholars routinely criticize federal courts for failing to scrutinize class action settlements closely enough, especially in cases like this, where plaintiffs' lawyers negotiate the settlement and their fee request at the same.  See, e.g., Alexandra Lahav, Fundamental Principles for Class Action Governance, 37 Ind. L. Rev. 65 (2003); Alon Klement, Who Should Guard the Guardians? A New Approach for Monitoring Class Action Lawyers, 21 Rev. Litig. 25 (Winter 2002); David Brainerd Parrish, The Dilemma: Simultaneous Negotiations of Attorneys' Fees and Settlement in Class Actions, 36 Hous. L. Rev. 531 (Summer 1999); and Sylvia R. Lazos, Note, Abuse in Plaintiff Class Action Settlements: The Need for a Guardian During Pretrial Settlement Negotiations, 84 Mich. L. Rev. 308 (Nov. 1985).

to measure the precise financial loss to the class, and thus to assess damages.  The motions phase of the litigation, which had barely begun at the time settlement occurred, would have required lengthy motions to dismiss and motions for summary judgment to sharpen the issues.  A trial in this case would likely have lasted at least three weeks and involved significant expert testimony.

Given these realities, early settlement saved the class substantial money in attorneys' and expert fees, and helped it to avoid the delay and uncertainty a trial necessarily entails.  This fact must weigh heavily in favor of settlement approval.

### 2. The Stage of the Proceedings When Settlement Has Been Offered and Degree of Completed Discovery

The parties reached a preliminary settlement in June 2005, just seven months after Freeport Partners filed its Complaint. See Pl.'s Resp. at 14.  At the time settlement occurred, Plaintiff's attorneys had completed very little independent factual discovery, relying instead on documents created by others, including "two reports published by the United States Senate, news articles, SEC filings" and pleadings filed in the Delaware derivative action.  Attorneys' Fees Motion at 6.  The only deposition they took, of former Riggs executive Steven Tamburo, occurred after the settlement agreement was signed.  Id.

By the standards of complex civil litigation, then, settlement occurred while this matter was still in its infancy.  Normally, Plaintiff and its attorneys would not have been able to assess the

strengths and weakness of their claims so soon after filing the Complaint and such an early settlement might well counsel against final approval.   That is not the case here, however, because Plaintiffs' counsel had access to a large number of government reports and news stories that detailed Defendants' activities with great specificity.  Such information enabled Plaintiff's lawyers to understand the essential contours of the case far earlier than is typical and to give more informed consideration to Defendants' settlement offer.

The timing of the settlement made sense for another reason as well: while the parties were negotiating in this case, a settlement was reached in the Delaware derivative action which, because it involved essentially the same class and same events, threatened to bar Plaintiff's claims entirely.  <u>See</u> Pl.'s Resp. at 15.  Faced with this reality, Freeport Partners made a reasonable calculation that to delay settlement further might jeopardize the very survival of its case.

Thus while the early settlement of a class action is generally cause for concern, the Court is satisfied that this settlement was not premature.  At the time they settled this case, Plaintiff's attorneys had an adequate basis for judging their chances of success on the merits.  Because of the Delaware settlement, furthermore, they had good reason to think that additional delays might jeopardize the interests of the entire class.

**3.  The Likelihood of Establishing the Requisite Elements of Liability and Damages**

Plaintiff admits that the legal theory it intended to pursue "rests on somewhat shaky grounds." See Attorneys' Fees Motion at 11. Because the theory has failed in five federal courts of appeal and succeeded in none, it seems to the Court that Plaintiff's characterization is charitable at best. See Roeder v. Alpha Indus., Inc., 814 F.2d 22 (1st Cir. 1987); Manson v. Stacescu, 11 F.3d 1127 (2d Cir. 1993); Crocker v. FDIC, 826 F. 2d 347 (5th Cir. 1987); Sax v. World Wide Press, Inc., 809 F.2d 610 (9th Cir. 1987); and Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., 140 F.3d 898 (11th Cir. 1998). Above all, it is clear that Plaintiff faced significant obstacles to establishing liability and damages. Thus early settlement, which promised immediate benefits, offered clear advantages to the class.

**4.  Class Reaction to Settlement**

Pursuant to the Court's November 30, 2005 Order, the Settlement Administrator mailed 16,110 Notice packets directly to members of the class, or to banks or brokerage houses for forwarding to the actual class members. See Fraga Aff. Despite the large number of Notices sent, virtually no opposition surfaced. One member of the class, who owned sixteen Riggs shares, requested exclusion.[10] See Notice of Request for Exclusion [Dkt. No. 51].

---

[10]   The shareholder, Lloyd W. Grooms, Sr., of Woodbridge, (continued...)

-24-

Another shareholder objected, but her concern was not about the settlement itself, but only about its provision requiring payment of attorneys' fees before the fund is distributed to the class. See Objection to Pl.'s Mot. for Attorneys Fees By Party of the Class Action [Dkt. No. 46].  That the class reacted to the proposed settlement with virtually unqualified support, presenting no substantive objection to it, strongly suggests that it is fair, reasonable, and adequate.  See Lorazepam II, 2003 WL 22037741 at *6 ("The existence of even a relatively few objections certainly counsels in favor of approval.").

### 5. The Ability of Defendant to Absorb a Larger Recovery

The record contains no information about whether Defendants could have absorbed a larger recovery for the class.  The Court notes, however, that because this class is virtually identical to the one certified in the Delaware derivative action, PNC stands liable for a significant amount of money in the aggregate.  The Delaware suit yielded $2.7 million for the class, and this settlement would give it an additional $5.25 million.  See Pl.'s Resp., Ex. I.  Accordingly, PNC could owe the class as much as $7.95 million arising out of the Riggs merger.  Even if PNC were able to pay more to the class, it is unclear that it would do so

---

[10] (...continued)
Virginia, is hereby excluded from the class, pursuant to his request.

voluntarily.  Plaintiff's calculation that its $5.25 million offer in this case was its "last and best" therefore seems reasonable, especially in light of PNC's additional liability arising out of the Delaware case.

In conclusion, when Freeport Partners accepted this settlement, it did so against a backdrop of extreme uncertainty and risk about the litigation's success.  Given the weakness of its legal theory, the likely length and complexity of this litigation, and the inherent risk of trial, any recovery would have come at great expense to the class, if at all.  After reasonably weighing the costs and benefits, Plaintiff accepted a settlement that it believed was in the best interests of the class.  It did so, furthermore, at a time when the settlement of parallel litigation threatened to extinguish Plaintiff's claims altogether.

Consequently, while there is no expert opinion buttressing the fairness of the $5.25 million settlement, it is clear that this litigation was risky from the start and that the odds of Plaintiff recovering at all were slim.  Given these realities, as well as the universally positive reaction of the class, the Court finds that the settlement is fair, reasonable, and adequate and should be approved pursuant to Rule 23(e).

**IV.   THE COURT WILL AWARD TO PLAINTIFF'S ATTORNEYS 22% OF THE GROSS SETTLEMENT FUND[11] IN FEES AS WELL AS $49,665.19 IN COSTS AND EXPENSES.**

**A.   Standard of Review**

"A litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980).  Where, as here, a common fund is created on behalf of a class, courts in this Circuit award attorneys' fees according to a "percentage-of-the-fund" approach. See Swedish Hospital Corp., 1 F.3d 1261, 1271 (D.C. Cir. 1993). That method gives trial courts substantial discretion to determine what percent of the total recovery is reasonable compensation for class counsel's efforts.  Id.  Generally, however, "a majority of common fund class action fee awards fall between twenty and thirty percent."  Id. at 1272.

Under the percentage-of-the-fund approach, seven factors guide courts in making fee awards:

> the size of the fund created and the number of persons benefitted; the presence or absence of substantial objections by members of the class to the settlement terms or fees requested by counsel; the skill and efficiency of the attorneys involved; the complexity and duration of the litigation; the risk of nonpayment; the

---

[11]   As of March 1, 2006, the settlement fund in Plaintiff's counsel's escrow account had grown to $5,332,011.97.  Because the fund continues to earn interest, the precise dollar figure of the fee award cannot be determined until disbursement of the fund takes place.  The fee will, in any event, exceed $1,155,000.

amount of time devoted to the case by plaintiffs' counsel; and the awards in similar cases.

Lorazepam II, 2003 WL 22037741 at *7; see also In re Baan Sec. Litig., 288 F. Supp. 2d 14 (D.D.C. 2003).

### B.  Analysis

Plaintiff's attorneys have requested 27% of the settlement fund, or approximately $1,417,500, in attorneys' fees and an additional $49,665.19 in costs and expenses. Attorneys' Fees Motion at 1-2.  This amount, they suggest, is "fair and reasonable under the circumstances." Id. at 2.

Swedish Hospital suggests that attorneys' fees awards in most cases will fall between 20% and 30% of the fund. Swedish Hosp. Corp, 1 F.3d at 1272.  With that principle in mind, the Court will use the seven Lorazepam II factors to determine where within that range the fee award in this case should fall. Lorazepam II, 2003 WL 22037741 at *7; see also Fresh Kist Produce, L.L.C. v. Choi Corp., Inc., 362 F. Supp. 2d 118, 128 (D.D.C. 2005).

### 1.  The Size of the Fund Created and the Number of Persons Benefitted

While the gross settlement fund of $5.25 million is fairly modest by class action standards, it is not insubstantial.  Its benefits, moreover, will redound to no fewer than 15,000 Riggs shareholders, a class that is similar in size to many of the recent class actions in this jurisdiction. See, e.g., Lorazepam I, 202 F.R.D. at 26 (certifying a class of approximately 12,000 members);

In re Baan, 288 F. Supp. 2d at 17 (noting that the class encompassed approximately 18,000 claimants); In re Newbridge Networks Sec. Litig., 1998 LEXIS 23238 *6 (D.D.C. 1998 (same). Both the size of the fund, and the number of persons benefitted by it, weigh in favor of counsel's fee request in this case. See In re Vitamins Antitrust Litig., 2001 WL 34312839 *11 (D.D.C. 2001).

### 2. The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms or Fees Requested by Counsel

Even though the Court required a copy of the Attorneys' Fees Motion to be included with the Notice to the Class, there was only one objection. See Dkt. No. 46. As noted above, however, the objector did not challenge the reasonableness of either the fee request or the settlement but only suggested that attorneys' fees should be paid after the class members themselves are compensated. Id. The fact that there is no substantive opposition, despite an unusually well-informed class, also supports the instant Attorneys' Fees Motion.

### 3. The Skill and Efficiency of the Attorneys Involved

The Court has already noted that lead counsel in this case are extremely skilled litigators who regularly represent plaintiff classes in complex state and federal matters. Throughout the course of this litigation, they have conducted themselves with a high degree of professionalism, presenting well-drafted and well-

argued pleadings and discharging all their tasks without undue delay. These facts, too, add support to the instant Motion.

### 4.   The Complexity and Duration of the Litigation

As discussed in greater detail above, this case had the potential to develop into extremely long and complicated litigation. Establishing Defendants' liability promised to be a difficult endeavor and would have required extensive discovery, lengthy dispositive motions, and, if necessary, a protracted trial. Because it settled so early, however, it was not necessary for counsel to undertake many of the time and labor-intensive tasks that would have been required at subsequent stages.

### 5.   The Risk of Nonpayment

When Plaintiff's counsel accepted this case on a contingency basis, they understood that there was an extremely high risk of nonpayment. See Attorneys' Fees Motion at 13. Nearly half of the federal courts of appeal had rejected Plaintiff's legal theory, no federal court of appeal had accepted it, and no court in this jurisdiction had even considered it. The likelihood of prevailing was remote at best.

In many circumstances, a high risk of nonpayment would counsel in favor of increasing the fee award to attorneys who secure a recovery for their client. See In re Baan, 288 F. Supp. 2d at 18. Courts are aware that without such an incentive, plaintiffs' lawyers might be less willing to take on cases that involve either

unsettled legal issues or clients who might otherwise go unrepresented. Public policy is served, therefore, by awarding somewhat higher fees to lawyers who assume the risk of such representation.

Here, however, where the risk of nonpayment arose from the courts' consistent rejection of Plaintiff's legal theory, this principle has less force. Plaintiff's counsel accepted this case knowing that they did not face an uncharted legal landscape. On the contrary, their client's position had been considered by many federal courts, and had been rejected time and again. While Plaintiff describes its theory as "novel and untested," the reality is that it was neither. See Pl.'s Resp. at 16.

In short, not only were Plaintiff's counsel very well aware of the risks they were taking with this representation in these circumstances, but they might have even faced Rule 11 challenges for bringing litigation that was not "warranted by existing law or by a nonfrivolous argument for the . . . reversal of existing law or the establishment of new law." Fed. R. Civ. P. 11(b)(2). In light of these considerations, the high risk of nonpayment in this case argues in favor of a reduction in the fees that would otherwise be awarded.

### 6. The Amount of Time Devoted to the Case by Plaintiffs' Counsel

With their Attorneys' Fees Motion, counsel has included lengthy and detailed exhibits describing their work in this case

and the amount of time spent on particular tasks.  Having carefully considered these documents, the Court must conclude that these experienced and sophisticated counsel, if their representations are to be believed, spent a great deal of time doing a fairly modest amount of work.

The majority of counsel's efforts fell into three categories: fact investigation and discovery, drafting of pleadings and motions, and settlement negotiations.  In at least two of those categories, Plaintiff's attorneys report an unreasonably high number of hours.  First, on fact investigation and discovery, they spent a combined 499.25 hours.  See Attorneys' Fees Motion, Ex. 1. Their actual work in this category, however, consisted of reviewing "two reports published by the United States Senate, news articles, SEC filings, and additional information gleaned from informal channels," taking one deposition, and reading the pleadings and depositions in the Delaware shareholders' action which totaled only 1,200 pages in length.  Id. at 6.

Second, counsel devoted a somewhat astounding 1,104.6 hours drafting pleadings and motions,[12] even though their work in this category was extremely limited by the standards of complex litigation.  Over the short course of this litigation, Plaintiffs filed exactly eight substantive documents excluding the instant

---

[12]  To put the figure in a "real world" context, 1,100 hours represent approximately one-half year of a hard-working lawyer's billable hours.

Motions: the Complaint, the Amended Complaint, four Oppositions to Motions to Dismiss by various Defendants, a Motion for Preliminary Class Certification and Settlement Approval, and their Response to the Court's Memorandum Order requiring additional information about the settlement.   This is not a case that required extensive briefing of complicated motions and it is unclear why more than 1,100 attorney hours were necessary in this category.

While counsel's work product in this case was of high quality, the number of hours spent was disproportionate to the amount of original work required of them.  Plaintiff's lawyers did not start from scratch in this litigation.  By their own admission, much of the original, investigative work required to build their client's case was done by others, namely the staff of the Senate Committee on Government Affairs and the lawyers in the Delaware derivative action.  Furthermore, the case settled before the most time and labor intensive phases of litigation – motions practice and trial preparation – had truly begun.  On these facts, and given the Court's duty to protect the class, counsel's fee request must be adjusted downward to reflect the excessive time spent performing a relatively modest amount of work.

### 7.   The Awards in Similar Cases

Although the precise fee award in any given case is firmly committed to the trial court's discretion, courts in this jurisdiction hew closely to the 20% - 30% range set forth in

Swedish Hospital. Several recent cases have awarded fees toward the higher end of that spectrum. See Consolidated Edison Co. v. Abraham, 2005 U.S. Dist. LEXIS 2250 (D.D.C. 2005) (awarding 30% of the settlement fund to plaintiffs' attorneys); Lorazepam II, 2003 U.S. Dist. LEXIS 12344 (awarding 30% plus expenses); In re Newbridge Networks Sec. Litig., 1998 U.S. Dist. LEXIS 12344 (D.D.C. 1998) (awarding 30% plus expenses); and In re Baan Sec. Litig., 288 F. Supp. 2d 14 (D.D.C. 2003) (awarding 28%). Others, however, have made awards at the lower end. See Swedish Hosp. Corp., 1 F.3d at 1261 (affirming fee award of 20%); Democratic Cent. Comm. of Dist. of Columbia, 3 F.3d 1568 (D.C. Cir. 1993) (affirming fee award of 23.3%); Fresh Kist Produce, L.L.C. v. Choi Corp., Inc., 362 F. Supp. 2d 118, 126 (D.D.C. 2005) (awarding 20%).

By requesting 27% of the fund, Plaintiff's counsel seeks fees that are at the high end of the permissible range. Moreover, when the work in this case is compared to that done in many of the cases counsel cite as similar, the award sought here seems unwarranted. See Attorneys' Fees Motion at 10-11. For example, in In re Baan, counsel, who received 28% of the settlement fund, conducted "over 25 depositions . . . in different locations throughout the country, as well as in the Netherlands." In re Baan, 288 F. Supp. 2d at 18. They reviewed "over 300,000 pages" in discovery and engaged in "considerable motions practice during the almost five-year pendency of this case." Id. Likewise, in In re Newbridge Networks,

counsel, who received 30% of the settlement fund, "engaged in extensive motions practice and conducted considerable discovery" over the course of four years.   <u>In re Newbridge Networks Sec. Litig.</u>, 1998 U.S. Dist. LEXIS 12344 *9.   Finally, in <u>In re Lorazepam</u>, class counsel, including the law firm of Cohen, Milstein, Hausfeld & Toll, who received 30% of the settlement fund, reached a settlement "only after 86 depositions . . . review and analysis of substantially more than a half-million pages of documents and approximately 92 CDs of data in electronic form, the filing . . . of at least 44 memoranda of law, an appeal to the D.C. Circuit, and protracted and difficult settlement negotiations." <u>Lorazepam</u> II,  2003 U.S. Dist. LEXIS 12344 *15.

Plaintiff's counsel's efforts in this case cannot possibly compare to the work performed in these other cases.   When settlement occurred, this litigation was barely a half-year old, no meaningful discovery had taken place, and only preliminary motions practice had begun.   During the entire pendency of this case, class counsel took exactly one deposition and prepared only eight substantive documents besides the instant Motions.   There is thus no basis for analogizing counsel's work in this case to that completed in <u>Baan</u>, <u>Newbridge Networks</u>, or <u>Lorazepam</u>, and awarding a similar percentage of the settlement fund in attorneys' fees would not be appropriate.

In conclusion, after balancing the relevant factors, the Court does not believe that this case merits a fee award of 27% of the fund.   Because the matter settled so early, counsel were not required to undertake many of the most difficult tasks required in complex litigation.   Whatever risk of nonpayment existed here resulted from the weakness of Plaintiff's legal theory, something that was apparent to counsel at the outset.   Plaintiff's lawyers relied heavily on investigations into Defendants' activities by the Senate Committee on Government Affairs and on the pleadings filed in the Delaware derivative action, and were able to prosecute this case without conducting any significant amount of independent discovery themselves.   Finally, the amount of time Plaintiff's counsel claims to have spent on many of the tasks they did complete is far in excess of what is reasonable.

For all of these reasons, the Court believes that a fee award of 22% of the fund, which will exceed $1,155,000, is fair and reasonable compensation for class counsel and more accurately reflects the value of the work they performed in this case and consideration of the seven factors set forth in <u>Lorazepam</u> II.

**V.   CONCLUSION**

Accordingly, for the foregoing reasons, Plaintiff's Motion for Final Approval of Class Action Settlement and Certification of the Settlement Class is hereby **granted**, and Plaintiff's Motion for Attorneys' Fees is hereby **granted in part and denied in part**.

An Order will issue with this Memorandum Opinion.


                                      /s/_____
March 13, 2006                        Gladys Kessler
                                      U. S. District Judge



**<u>Copies to</u>: attorneys on record via ECF**